EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estado Libre Asociado de P.R. et als<br><br>    Recurrido<br><br>               v.<br><br>Lucas Malavé h/n/c Supermercado<br>Jardines de Caparra<br><br>    Peticionario | Certiorari<br><br>2002 TSPR 96<br><br>157 DPR \_\_\_\_ |

Número del Caso: CC-2000-1042

Fecha: 28/junio/2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional II

Panel integrado por su Presidente, el Juez Gierbolini, la
Juez Hernández Torres y la Juez Pabón Charneco

Abogada de la Parte Peticionaria:
                    Lcda. Maribella Maldonado Pérez

Oficina del Procurador General:
                    Lcda. Carmen A. Riera Cintrón
                    Procuradora General Auxiliar

Materia: Revisión Administrativa

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico et als

     Recurrido

        v.

                     CC-2000-1042

Lucas Malavé h/n/c
Supermercado Jardines de
Caparra

     Peticionario

Opinión del Tribunal emitida por la Juez Asociada señora NAVEIRA DE RODÓN

San Juan, Puerto Rico, a 28 de junio de 2002

Nos corresponde determinar en qué circunstancias existe una violación a la Ley para Regular las Operaciones de Establecimientos Comerciales, Ley Núm. 1 de 1 de diciembre de 1989, según enmendada, 29 L.P.R.A. sec. 301 *et seq*. (en adelante Ley de Cierre), la Ley Antimonopolística y sobre Restricciones al Comercio, Ley Núm. 77 de 25 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 257 *et seq*. (en adelante Ley de Monopolios), y el Reglamento sobre Competencia Justa Número VII de 22 de abril de 1980, cuando se trata de un negocio mixto, donde se realizan conjuntamente transacciones

comerciales de productos exentos y productos no exentos. Resolvemos que en estos casos, es necesario probar, no sólo que se abrió el establecimiento comercial durante las horas proscritas, sino que además se vendieron los artículos no exentos. Así lo resolvimos recientemente en E.L.A. v. Frig. y Alm. del Turabo, Inc., res. el 28 de agosto de 2001, 155 D.P.R. ____ (2001), 2001 TSPR 120, 2001 JTS 125, pág. 70. Cabe señalar además que las barreras físicas para separar las distintas áreas, no constituyen las únicas precauciones que el negocio puede adoptar para evitar las operaciones no exentas durante horas de cierre.

I

Mediante Resolución de 9 de marzo de 2000, el Departamento de Asuntos del Consumidor (en adelante D.A.C.O.) determinó que el señor Lucas Malavé, h/n/c Supermercado Jardines de Caparra, había violado el Art. 5 de la Ley de Cierre, 29 L.P.R.A. sec. 304, el Art. 3(a) de la Ley de Monopolios, 10 L.P.R.A. sec. 259(a), y el Reglamento sobre Competencia Justa Núm. VII. Dicha violación consistió en haber abierto al público las puertas de su negocio el domingo 21 de agosto de 1994 a las 8:10 de la mañana.[1] Por dicha violación se le impuso al señor Malavé una multa administrativa de diez mil dólares ($10,000), más el pago de

---

[1] Cabe señalar que no fue hasta tres (3) años más tarde que se presentó la querella ante D.A.C.O. Nos preocupa que en un caso de esta naturaleza el Departamento de Justicia haya tardado tres (3) años en presentar la querella. Esta tardanza puede dificultarle al querellado el poder desarrollar una defensa efectiva. Para una crítica sobre la práctica del Departamento de Justicia de no radicar las

dos mil dólares ($2,000) por concepto de honorarios de abogado a favor de la Oficina de Asuntos Monopolísticos.  Además, se le ordenó cesar y desistir de incurrir en la práctica antes referida.

La posición del Departamento de Justicia era y es que a la fecha de los hechos el Supermercado Jardines de Caparra operaba como un solo negocio que tenía una  panadería y un supermercado.  Los hechos que apoyaron las determinaciones de D.A.C.O. se basaron principalmente en el escueto testimonio vertido en la vista administrativa por el agente del Negociado de Investigaciones Especiales del Departamento de Justicia, el Sr. Ismael Cintrón Cintrón.

Éste declaró que para la fecha de los hechos, el domingo 21 de agosto de 1994, como parte de una investigación sobre posibles violaciones a la Ley de Cierre, se personó al negocio conocido como Supermercado Jardines de Caparra, cuyo dueño era el señor Malavé.  Frente a este negocio había un estacionamiento y al lado una panadería y una agencia hípica.  Dentro del negocio había un área de varias góndolas con productos propios de supermercado, un área para carnicería y otra a la izquierda para una panadería.  Continuó declarando que no había divisiones entre las áreas en que estaban estos distintos tipos de negocios.  Al entrar observó que una de las cajas estaba abierta y había personas comprando.  No especificó qué tipo de productos compraban.  No entró a la panadería, aunque pudo ver que estaba abierta.  Declaró que no sabía si allí vendían café.  Tampoco compró producto alguno.  De su escueto testimonio se puede colegir

---

querellas de esta naturaleza prontamente, véase E.L.A. v. Frig. y Alm. del Turabo, Inc., supra, esc. 10.

con meridiana claridad que aparentemente estuvo muy poco tiempo en el negocio. En sus propias palabras – "[e]ntré a dicho supermercado encontrando una de las cajas abiertas y personas comprando en él ... Luego ese mismo día, o sea, me retiré y seguí realizando otras investigaciones."

Según se desprende de los documentos que obran en el expediente y la Resolución de D.A.C.O., los ingresos del negocio se rendían en una sola planilla y los informes trimestrales de salarios pagados a los empleados se sometían en conjunto. En la semana de 21 de agosto de 1994 la nómina estaba compuesta de trece (13) empleados. El día de los hechos dos (2) empleadas, Elisa Ayala y Desiré Salas, poncharon sus tarjetas de trabajo a las 7:30 y 8:00 de la mañana respectivamente. Seis (6) de los empleados estaban en la nómina rotulada "bakery" (panadería). Dos (2) de las empleadas que aparecían en la nómina de "bakery" también aparecían en las tarjetas ponchadas de los empleados como cajeras no bajo "bakery". Las cuatro (4) empleadas restantes estaban tanto en las nóminas como en las tarjetas ponchadas bajo "bakery".

A base de estos hechos, D.A.C.O. acogió la posición del Departamento de Justicia y determinó que el Supermercado Jardines de Caparra era un solo negocio y que, como el señor Malavé no logró probar que existían dos (2) negocios, o sea, una separación entre el supermercado y la panadería-cafetería, al abrir al público un domingo antes de las 11:00 de la mañana había violado la Ley de Cierre, la Ley de Monopolios y el Reglamento de Competencia Justa Número VII. En otras palabras, en el caso de autos, para probar una violación a estas leyes bastó con aportar prueba de que se

rendía una sola planilla, que los informes trimestrales de salario se presentaban conjuntamente, que se podía entrar en todas partes del negocio, que se abrió el negocio antes de las 11:00 de la mañana y que algunos clientes compraron algunos productos, sin que se especificase si se trataba de productos exentos, los de la panadería (pan, café, etc.), o no exentos, los del supermercado propiamente. Lo clave para D.A.C.O. era que siendo un sólo negocio, se abriera al público antes de las 11:00 a.m.

Inconforme con la determinación de D.A.C.O., el señor Malavé presentó un recurso de revisión ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito). Arguyó que erró el foro administrativo al concluir que la panadería-cafetería y el supermercado eran un solo negocio y al determinar que la actividades comerciales que realizaba el negocio no estaban exentas de cumplir con la Ley de Cierre. Dicho Tribunal, el 13 de octubre de 2000, emitió una resolución mediante la cual resolvió que el señor Malavé no logró demostrar que la determinación de D.A.C.O. fue una arbitraria, irrazonable y carente de base racional alguna, por lo tanto, se sostenía la conclusión de que la panadería-cafetería y el supermercado eran un solo negocio, por lo que al abrir un domingo a las 8:10 de la mañana, el señor Malavé había incurrido en una violación a la Ley de Cierre, la Ley de Monopolios y el Reglamento de Competencia Justa Núm. VII. En consecuencia, confirmó la determinación de D.A.C.O.

Denegada la solicitud de reconsideración, el señor Malavé acudió en certiorari ante nos y planteó que el foro apelativo erró: al determinar que existía evidencia

sustancial para concluir que había violado la Ley de Cierre, la Ley de Monopolios y el Reglamento de Competencia Justa Núm. VII; y al concluir que los negocios que éste tenía eran uno solo porque los ingresos provenientes de éstos los tributaba en la misma planilla de contribución sobre ingresos. Decidimos revisar y expedimos el recurso.

II

Las disposiciones estatutarias pertinentes que regulan las operaciones de los establecimientos comerciales, contienen un lenguaje peculiar al referirse a lo que pueden o no pueden hacer dichos establecimientos durante el horario y los días a que hacen referencia. A manera de ejemplo, en el Art. 5 de la Ley de Cierre, 29 L.P.R.A. sec. 304, se expresa que los mismos "podrán abrir al público"; de otra parte, en el último párrafo del Inciso (n) del Art. 6 de dicha ley, 29 L.P.R.A. sec. 305, se habla de la realización de "operaciones cubiertas por las excepciones de esta sección" y, a renglón seguido, se expresa que en los casos allí especificados el establecimiento "podrá realizar solamente las operaciones exentas"; etc.

De dicha fraseología se puede inferir que el legislador, al autorizar o prohibir actividades, se refiere a operaciones de venta de artículos. Debido a ello es que en E.L.A. v. Frig. y Alm. del Turabo, Inc., supra, pág. 70, expresamos que en situaciones de negocios que se dedican tanto a la venta al por mayor como a la venta al detal --situación regulada por el Art. 6-- los mismos **"puede[n] abrir sus puertas antes de las 11:00 a.m., lo que no puede hacer es vender productos al detal [no exentos] antes de dicha hora."** Ello aplica a

establecimientos como el del caso de autos, que tienen en un mismo lugar operaciones exentas y no exentas.

Como vemos, la Ley de Cierre contempla la posibilidad de que en un mismo establecimiento comercial se realicen actividades comerciales exentas conjuntamente con otras no exentas.  Bajo estas circunstancias el establecimiento comercial podrá operar sin las restricciones impuestas por la Ley de Cierre todo lo relacionado con las actividades económicas exentas.  Esta fue precisamente la situación del señor Malavé.  Éste mantenía en el mismo establecimiento comercial una panadería-cafetería, un negocio exento,[2] y un supermercado, un negocio no exento.

Por otra parte, en su Art. 6 la Ley de Cierre, "le impone al dueño del establecimiento comercial, que realiza actividades comerciales mixtas, la obligación de tomar todas las precauciones que sean necesarias para impedir el acceso al público consumidor al área restringida y así evitar que se realicen operaciones no exentas durante las horas de cierre establecidas por ley."  En el caso de autos tanto D.A.C.O. como el Tribunal de Circuito de Apelaciones resolvieron que la falta de precauciones quedó demostrada ya que el agente Cintrón Cintrón declaró que los clientes recorrían todo el establecimiento comercial libremente.  Además, entendieron que para infringir el Art. 5 de la Ley de Cierre basta "con establecer que el área no exenta estaba abierta o expuesta al público fuera de las horas permitidas."  En otras palabras

---

[2]     El Art. 6(d) de la Ley de Cierre, 29 L.P.R.A. sec. 305(d) específicamente dispone que no estarán sujetos a las disposiciones de apertura y cierre de dicha Ley, los establecimientos comerciales "dedicados principalmente a la elaboración de alimentos y venta directa al público de comidas

no hay que probar que se vendieron o vendían productos no exentos durante las horas proscritas por la Ley de Cierre. Este enfoque es equivocado y va contra de lo resuelto en E.L.A. v Frig. y Alm. del Turabo, Inc., supra.  El Estado, al encausar a dichos establecimientos, **tiene que aportar prueba directa o circunstancial de que se incurrió en la práctica prohibida de venta.**

D.A.C.O. y el Tribunal de Circuito de Apelaciones parecen entender además que las únicas precauciones aceptables al amparo del Art. 6 son las separaciones físicas, pues es la falta de éstas las que sirvieron de base a la violación a la Ley de Cierre.  Ahora bien, el Art. 6, además de advertirle al dueño de un negocio mixto que debe tomar precauciones necesarias para que no ocurra la venta de productos no exentos, también dispone específicamente que "[E]l **Secretario del Trabajo y Recursos Humanos** tendrá facultad para vigilar y requerir el cumplimiento de esta disposición y **señalará por reglamento las precauciones que deberán observarse en la situación aquí prevista.**"

A pesar de que esta disposición se adoptó en el 1989, el Secretario aún no ha aprobado reglamento que indique cuáles deberán ser las precauciones a observarse respecto a este particular.  En ausencia de reglamentación que disponga las medidas que se considerarán como precauciones necesarias y apropiadas para evitar, en los negocios mixtos, las operaciones no exentas durante las horas de cierre, resulta indispensable evaluar en cada caso la efectividad de las medidas tomadas por dicho negocio, ya fueren divisiones

---

confeccionadas    u    otros    alimentos,    incluyendo    ...
panaderías..."

físicas o una política comercial, rigurosamente instrumentada, de no vender artículos no exentos durante las horas prohibidas. No basta con que no haya divisiones físicas para que se determine que se ha violado la ley por no haber adoptado las precauciones necesarias y apropiadas, especialmente cuando no se ha probado la venta de algún producto no exento. Después de todo, una política de no venta estrictamente implementada, puede resultar mucho más efectiva que una división física, no cumplimentada con una política de no venta.

Así pues, resolvemos que para probar una infracción a la Ley de Cierre se requiere prueba directa o circunstancial de que efectivamente se realizó la venta de productos no exentos durante las horas prohibidas. Después de todo, la Ley de Cierre tiene como propósito no solo proteger a los trabajadores que laboran los domingos y días feriados predeterminados por ley, sino también proteger a los pequeños y medianos comerciantes de la competencia de las grandes cadenas comerciales.[3] Se protege contra la competencia de las grandes cadenas a los pequeños y medianos comerciantes, cuando efectivamente se impiden las ventas de productos no exentos durante las horas prohibidas.

Además, reolvemos que hasta que el Secretario del Trabajo y Recursos Humanos no determine, mediante reglamento, cuales son **las precauciones necesarias** que los negocios mixtos deben tomar para evitar la venta de productos no exentos, cada caso deberá evaluarse a la luz de sus hechos

---

[3]    Informe de la Comisión Especial sobre el Estudio de la Ley de Cierre de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 819 de 25 de octubre de 1989.

particulares para determinar si las medidas adoptadas son adecuadas o no.

A la luz de la normativa expuesta, analicemos el caso de marras.

III

D.A.C.O. determinó que se violó la Ley de Cierre porque se abrió al público, a las 8:10 de la mañana, un solo negocio, compuesto de un supermercado, una panadería y una carnicería. Esta fue la posición adoptada por el Departamento de Justicia. El Tribunal de Circuito avaló esta conclusión. Todos se equivocaron en su análisis. En E.L.A. v. Frig. y Alm. del Turabo, Inc., supra, pág. 69 expresamos que no debíamos "aplicar los términos de esta Ley de manera rígida e inflexible." Reiteramos lo resuelto en dicho caso: **los negocios mixtos pueden "abrir sus puertas los domingos antes de las 11:00 a.m., lo que no pueden hacer es vender productos [no exentos] antes de dicha hora."**

Como ya expresáramos, el presente caso trata de un negocio mixto, donde se venden productos exentos, una panadería-cafetería, y no exentos, un supermercado, que abrió al público consumidor un domingo antes de las 11:00 de la mañana. De la prueba creída por D.A.C.O. no surge que hubieran barreras físicas para separar un área de otra. Tampoco surge que se hubieran vendido productos no exentos. El Departamento de Justicia no aportó la prueba necesaria, ni directa ni circunstancial, para que D.A.C.O. pudiese hacer este análisis. Bajo estas circunstancias, no se probó que el señor Malavé hubiese violado la Ley de Cierre.

En vista de todo lo anterior, se revocan tanto la Resolución del Tribunal de Circuito de Apelaciones como la de D.A.C.O., y se desestima la querella presentada contra el señor Malavé.


Miriam Naveira de Rodón
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico et als

    Recurrido


      v.                          CC-2000-1042


Lucas Malavé h/n/c
Supermercado Jardines de
Caparra

    Peticionario


SENTENCIA


San Juan, Puerto Rico, a 28 de junio de 2002

    Por los fundamentos expuestos en la Opinión que antecede, se revocan tanto la Resolución del Tribunal de Circuito de Apelaciones como la del Departamento de Asuntos del Consumidor, y se desestima la querella presentada contra el señor Malavé.

    Lo acordó el tribunal y certifica la Secretaria del Tribunal Supremo.  El Juez Asociado señor Hernández Denton emitió una Opinión disidente, a la cual se unió el Juez Asociado señor Rivera Pérez.  El Juez Asociado señor Rivera Pérez emitió una Opinión disidente, a la cual se unieron los Jueces Asociados señores Hernández Denton y Corrada del Río.


Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Estado Libre Asociado de
Puerto Rico, et al

    Recurrido

       v.                           CC-2000-1042
       Certiorari


Lucas Malavé h/n/c
Supermercado Jardines de
Caparra

    Peticionario


**Opinión Disidente emitida por el Juez Asociado señor Hernández Denton, a la cual se une el Juez Asociado señor Rivera Pérez.**


San Juan, Puerto Rico a 28 de junio de 2002.


**Como la Opinión del Tribunal ha desvirtuado por completo la Ley para Regular las Operaciones de Establecimientos Comerciales[4] (en adelante Ley de Cierre) y ha desarticulado la protección que tradicionalmente ha provisto la Asamblea Legislativa para el descanso de nuestro trabajador puertorriqueño los domingos y días feriados, disentimos. Además, nos unimos a la Opinión Disidente del Juez Asociado señor Rivera Pérez.**

---

[4] Ley Núm. 1 de 1 de diciembre de 1989, según enmendada, 29 L.P.R.A. sec. 301 et seq.

I

El Supermercado Jardines de Caparra es un establecimiento comercial que se compone de un área de supermercado y un área de panadería-cafetería. Como parte de una de las investigaciones de rigor que realiza D.A.C.O., un inspector acudió al establecimiento y observó que el domingo, 21 de agosto de 1994, a las 8:10 a.m. los clientes discurrían indistintamente por entre las góndolas del supermercado y la panadería-cafetería.

A juicio de la agencia el referido establecimiento comercial operaba como un solo negocio, pues no se registraban en planillas separadas las operaciones del supermercado y la panadería. En vista de esto, D.A.C.O. le impuso una multa al señor Lucas Malavé, dueño del Supermercado Jardines de Caparra, por violación al Artículo 5 de la Ley de Cierre, porque abrió las puertas de todo su establecimiento comercial al público a las 8:10 a.m.

Inconforme, Lucas Malavé acudió al Tribunal de Circuito de Apelaciones señalando que su operación en el área de la panadería estaba exenta de la Ley de Cierre y que su negocio no excedía del número de empleados que dispone la ley para que le aplicaran sus horarios. No obstante, el foro apelativo otorgó deferencia al dictamen de D.A.C.O. y confirmó la multa impuesta. De este dictamen, él acude ante nos reproduciendo, en esencia, el mismo argumento.

En la presente controversia la Opinión del Tribunal determina correctamente que el negocio en cuestión se compone de una operación exenta (la panadería) y otra no-exenta (el supermercado). Sin embargo, exige

equivocadamente que se demuestre la venta de un artículo no exento para que proceda la multa al establecimiento comercial. A tenor con esto, la Opinión del Tribunal concluye que como no se pasó prueba a tales efectos procede revocar el dictamen del Tribunal de Circuito de Apelaciones y, por ende, del Departamento de Asuntos del Consumidor.

Diferimos de este curso decisorio en tanto deja sin efecto subrepticiamente el texto claro de la Ley de Cierre que establece como único criterio la apertura del establecimiento, y soslaya los objetivos para los cuales el Legislador la promulgó. Veamos.

## II

La Ley de Cierre se estableció principalmente para castigar a aquellos establecimientos que <u>abren</u> fuera de los horarios establecidos y, por ende, fuerzan a los obreros a abandonar aquel día de la semana reservado para su descanso en compañía de su familia. Es por esta razón que dicha Ley establece insistentemente que el criterio para multar es la <u>apertura</u> de los establecimientos, poco importa si se vende o no un artículo a la hora de salvaguardar dicho objetivo.

La Opinión del Tribunal acomodaticiamente ignora el que el cierre del establecimiento requerido por la ley asegura el descanso y recreación  del empleado y sus familiares en un mundo en que cada vez tenemos menos tiempo para esos menesteres. Sorprendentemente impone por fiat judicial un criterio distinto al de la Ley de Cierre y exige que se pruebe la venta de un artículo en el establecimiento para que se pueda demostrar la violación del estatuto. Esta exigencia provoca inevitablemente una situación anómala

donde a los empleados se les podrá requerir que trabajen fuera de los horarios señalados, siempre y cuando no se efectúen ventas de artículos en dicho negocio. Ciertamente, este criterio contraviene y distorsiona la protección que quiso proveerle el Legislador a los empleados a través de la legislación aludida.

La Ley de Cierre está cimentada en promover, hasta lo posible, la existencia del domingo como determinado día de descanso , y por ende, la integridad física del trabajador y la unidad del núcleo familiar. <u>Pueblo Int'l, Inc. v. Srio. De Justicia</u>, 117 D.P.R. 754. (voto concurrente del Juez Asociado señor Negrón García). La designación del domingo, como día colectivo de descanso es una conquista social de inmenso valor. Responde al concepto legislativo de que el ser humano —física, mental y recreativamente— es acreedor a un merecido paréntesis de sosiego durante la jornada regular semanal. Sin límites, tendríamos que vivir una jornada diferente, en última instancia, a expensas de las necesidades y voluntad patronal. <u>Escalera v. Andino</u>, 76 D.P.R. 268 (1954).

A tenor con estos principios, en su Artículo 3 se especifica que en los días feriados habrá <u>cierre total</u> en los establecimientos comerciales de nuestro país. Así dispone: "[l]os establecimientos comerciales permanecerán <u>cerrados</u> durante todo el día, sin que pueda <u>realizarse en los mismos ninguna clase de trabajo</u>, excepto que a discreción del dueño [...] podrán realizar aquellas labores relacionadas con la continuidad de sus operaciones y el mantenimiento." (Énfasis suplido), 29 L.P.R.A. 302. Por su parte, el Artículo 4 establece, en lo referente a la

apertura parcial, que: "los establecimientos comerciales podrán abrir al público en los días y horarios [señalados]". Además, expone que "[l]os establecimientos comerciales permanecerán cerrados sin que pueda realizarse en éstos ninguna clase de trabajo fuera del horario que se establece en los incisos (a) y (b) de esta sección". (Énfasis suplido) 29 L.P.R.A. 303. En lo concerniente a la apertura dominical se establece también que:

> "[l]os establecimientos comerciales podrán abrir al público durante los días domingo solamente durante el horario desde las 11:00 a.m. hasta las 5:00 a.m. ... Los establecimientos comerciales permanecerán cerrados los domingos sin que pueda realizarse en éstos ninguna clase de trabajo fuera del horario que se establece en esta sección excepto que a discreción del dueño ... podrán realizar aquellas labores que se relacionen con la continuidad de sus operaciones y el mantenimiento de su planta física." 29 L.P.R.A. 304. (Énfasis suplido).

Tan específica es la ley en este aspecto que en su Artículo 7 dispone que los establecimientos que abran los domingos dentro del horario permitido, sólo podrán utilizar aquellos empleados que trabajen a tiempo parcial con una jornada que no exceda de veintidós (22) horas a la semana. Véase, 29 L.P.R.A. 306. Así también dispone que los trabajadores técnicos, profesionales, ejecutivos y administradores que trabajen en el establecimiento comercial no trabajarán dos (2) domingos de forma consecutiva. Id. En cuanto a la compensación, el Artículo 9 dispone que todo patrono de un establecimiento comercial que obligue a trabajar a un empleado durante los domingos en contravención a lo dispuesto en la ley, o que despida, suspenda o discrimine contra cualquier empleado por reclamar sus derechos bajo la misma, incurrirá en

responsabilidad civil por una suma igual al triple del importe de los daños que el acto le haya causado al empleado o por una suma no menor de dos mil (2,000) dolares, ni mayor de diez mil (10,000) dólares a discreción del tribunal. Véase, Artículo 9, 29 L.P.R.A. sec. 308.

En cuanto a los negocios mixtos, es decir, aquellos establecimientos comerciales que realizan operaciones exentas y no exentas del horario fijado por la ley, el Artículo 6 sostiene que:

> Cuando un establecimiento comercial realice operaciones cubiertas por las excepciones de esta sección conjuntamente con operaciones sujetas a las disposiciones de las secs. 302, 303 y 304 de este título, <u>podrá realizar solamente las operaciones exentas</u> bajo esta sección de forma continua y sin sujeción al horario establecido en las secs. 302, 303 y 304 de este título y <u>tomará todas las precauciones que sean necesarias para impedir el acceso del público consumidor y evitar las operaciones no exentas durante las horas de cierre</u> dispuestas en este Capítulo. (Énfasis suplido) 29 L.P.R.A. 305.

Nótese la insistencia del legislador en detallar cuando deben <u>abrir</u> y <u>cerrar</u> los establecimientos para asegurar que el empleado no realice "ninguna clase de trabajo fuera de horario", y de esta forma proteger aquel descanso que interesa proveerle a la clase obrera de nuestro país. El criterio recurrente en todas las secciones de la Ley de Cierre es la apertura del establecimiento comercial. Sin lugar a dudas, la ley pretende regular exclusivamente aquella conducta que su propio nombre nos revela: la Ley de <u>Cierre</u>.

Sin embargo, a pesar de las claras disposiciones anteriores, la Opinión del Tribunal señala infundadamente que en dicha fraseología se puede inferir que "el

legislador, al autorizar o prohibir actividades, se refiere a operaciones de venta de artículos". En primer lugar, en ninguna parte de la ley se asoma tal inferencia. En segundo lugar, concluir como lo hace la mayoría que la protección de la Ley de Cierre es de la "venta de artículos" y no de la apertura del establecimiento, se deja desprovisto de protección el periodo de descanso celosamente guardado por el Legislador.

La Opinión del Tribunal basa su análisis en E.L.A. v. Frig. y Alm. Del Turabo, Inc., res. el 28 de agosto de 2001, 2001 TSPR 120, como único fundamento para sostener que el criterio para multar los establecimientos es que se demuestre que se vendieron artículos. Definitivamente, la intención del Tribunal no fue abandonar y desvirtuar con las expresiones anteriores el criterio de apertura que expuso el Legislador, tal como propone la Mayoría. De hecho, en ningún momento se cuestionó la apertura del establecimiento como criterio para multar los establecimientos. Por el contrario, en el contexto particular de E.L.A. v. Frig. y Alm. Del Turabo, Inc., supra, se distinguió a qué establecimiento comercial no le aplicaba la Ley de Cierre. Resolvimos que a un establecimiento comercial cuyas ventas sean solamente al por mayor no le aplicaba dicha ley, mientras que los negocios mixtos de venta al detal y al por mayor sí. En esas circunstancias específicas cobró relevancia la venta del artículo para diferenciar qué era una venta al detal y una al por mayor. Por tal razón sostuvimos que después que no se vendieran productos al detal, el negocio podría funcionar fuera de los horarios designados. Sin embargo,

las mismas de ninguna manera pretendían eliminar la protección otorgada al trabajador en la Ley de Cierre.

A la luz de la normativa anterior, analicemos la presente controversia.

### III

Ciertamente, la referida legislación provee para que se puedan realizar operaciones exentas sin sujeción al horario establecido en sus secciones. Sin embargo, deben tomarse todas las precauciones que sean necesarias para impedir el acceso del público consumidor y evitar las operaciones no exentas durante las horas de cierre. Véase 29 L.P.R.A. sec. 305.

En el caso de autos, el dueño del Supermercado abrió a las 8:10 a.m. su establecimiento y permitió el libre acceso de los clientes a todas las áreas del Supermercado, las exentas y las no exentas. No tomó ninguna providencia que atendiera las exigencias claras del legislador para evitar dicho acceso. Más importante aún, no dio indicio alguno de evitar las operaciones no exentas durante las horas de cierre. Por ello, razonablemente podemos concluir que si tenía abierta esta parte del supermercado hubo una violación por parte del dueño al horario dispuesto en la ley. Además, al mantener abierta esta parte del supermercado requería que tuviera suficientes empleados para atender cualquier problema que tuvieran los clientes en dicha sección, obligando así a éstos a trabajar precisamente durante las horas protegidas por el estatuto.

Como es sabido, es regla de hermenéutica judicial, que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no conduzcan a resultados

absurdos, sino armoniosos. <u>PARDAVCO, Inc. v. Srio. de Hacienda</u>, 104 D.P.R. 65 (1975). Tal y como interpreta la Mayoría la Ley de Cierre, se protege más al dueño del establecimiento que abre el mismo fuera de las horas permitidas, que la necesidad legítima que tienen sus empleados de un descanso durante las horas que detalla la ley. No nos cabe duda que el único criterio que asegura precisamente que no se realicen trabajos durante las horas señaladas y que a su vez se proteja el descanso de los empleados, es que mantengan cerradas las partes de los supermercados que venden productos no exentos por la ley.

Ante este tipo de legislación que regula la actividad económica y social, los tribunales deben actuar con deferencia a las determinaciones de la Rama Legislativa. <u>Salas v. Municipio de Moca</u>, 119 D.P.R. 625 (1987). La Opinión del Tribunal da al traste con esta normativa, deja sin efecto subrepticiamente la Ley de Cierre y soslaya los objetivos para los cuales la Legislatura la promulgó. De esta forma, trastoca el criterio básico de la Ley de Cierre, la apertura de los establecimientos, en franca contradicción a lo expuesto por la Rama Legislativa. Por ende, respetuosamente disentimos.


Federico Hernández Denton
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estado Libre Asociado de
Puerto Rico, rep. por el
Secretario de Justicia

      Recurrido

        v.

                         CC-2000-1042   Certiorari

Lucas Malavé h/n/c
Supermercado Jardines de
Caparra

      Peticionario

**Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez, a la cual se unieron los Jueces Asociados señores Hernández Denton y Corrada del Río.**

San Juan, Puerto Rico, a 28 de junio de 2002.

La Mayoría determina que el peticionario no incurrió en violación alguna a la Ley para Regular las Operaciones de Establecimientos Comerciales de Puerto Rico,[5] a la Ley de Monopolios de Puerto Rico,[6] y al Reglamento sobre Competencia Justa Núm. VII, adoptado por la Junta Especial sobre Prácticas Injustas de Comercio de la Oficina de Asuntos Monopolísticos del Departamento de Justicia de Puerto Rico.[7] La decisión mayoritaria se sostiene en que **no se demostró por el Departamento de Asuntos del Consumidor que se efectuó la venta de un artículo no exento bajo el primero de los referidos estatutos**. La Mayoría establece que para que haya una violación al estatuto que regula las operaciones de establecimientos comerciales tiene que demostrarse, mediante prueba directa o circunstancial, que en efecto ocurrió una venta de un artículo no exento por el estatuto, dentro del período prohibido para así hacerlo. Establece, además, la Opinión Mayoritaria que la mera ausencia de restricciones o barreras físicas para impedir el acceso del público a las áreas restringidas no constituye una violación a las disposiciones estatutarias arriba mencionadas. Respetuosamente, disentimos por los fundamentos que expondremos a continuación.

---

[5] Ley Núm. 1 de 1 de diciembre de 1989, 29 L.P.R.A. sec. 301 et seq.

[6] Ley Núm. 77 de 25 de junio de 1964, 10 L.P.R.A. sec. 257 et seq.

[7] Reglamento para la Ejecución de la Ley Núm. 77 de 25 de junio de 1964, promulgado el 22 de abril de 1980.

I

El señor Lucas Malavé Rivera era dueño y operaba el Supermercado Jardines de Caparra, localizado en el Centro Comercial Jardines de Caparra en Bayamón, Puerto Rico. En dicho establecimiento comercial se vendían artículos de supermercado y se operaba una panadería.[8]

El domingo 21 de agosto de 1994, el Departamento de Justicia de Puerto Rico, por medio del Negociado de Investigaciones Especiales, realizó una investigación y encontró que el establecimiento comercial del señor Lucas Malavé Rivera había abierto al público en general a las 8:10 de la mañana.[9] El 3 de noviembre de 1997, el Departamento de Justicia presentó una querella en contra de éste ante el Departamento de Asuntos del Consumidor,[10] alegando que el querellado había violado el Artículo 5 de la Ley para Regular las Operaciones de Establecimientos Comerciales,[11] así como el Artículo 3(a) y 9 de la Ley de Monopolios de Puerto Rico.[12] Arguyó, además, que el querellado había violado las disposiciones de los Artículos III y IV, inciso 32, del Reglamento sobre Competencia Justa Número VII que proscribe métodos injustos de competencia comercial.[13] La vista administrativa se celebró el 13 de agosto de 1999.[14] A la misma compareció como testigo el agente del Negociado de Investigaciones Especiales, señor Ismael Cintrón Cintrón.

---

[8] Apéndice IV del recurso de <u>Certiorari</u>, pág. 42.

[9] Íd.
[10] Íd., págs. 51-54.

[11] 29 L.P.R.A. sec. 304.

[12] 10 L.P.R.A. secs. 259 y 265.

[13] Apéndice IV del recurso de <u>Certiorari</u>, pág. 51.

[14] Apéndice III, Íd., pág. 18.

Dicho agente testificó que el día de la investigación el Supermercado Jardines de Caparra había abierto al público en general a las 8:10 de la mañana.[15] Añadió que el área de supermercado estaba compuesta por varias góndolas, donde se vendían distintos artículos. Expresó, que el establecimiento contaba con un área de carnicería y otra de panadería.[16] El agente Cintrón Cintrón testificó que los clientes del establecimiento entraban tanto al área de la panadería como a la del supermercado, incluyendo la carnicería, como si se tratara de un solo negocio.[17]

La evidencia documental presentada en la vista, así como el propio testimonio del señor Lucas Malavé Rivera, demostró que el querellado rendía una sola planilla de contribución sobre ingresos, en cuanto a los ingresos que recibía de la panadería y del área de supermercado.[18] Asimismo, quedó demostrado que los informes trimestrales de los salarios pagados a los empleados de ambas operaciones de negocios eran sometidos en conjunto ante el Departamento del Trabajo de Puerto Rico.[19] Se encontró probado que, para la semana que comprende el 21 de agosto de 1994, el señor Lucas Malavé Rivera tenía en nómina a trece (13) empleados.[20] Para esa misma fecha, dos (2) empleadas del área de supermercado habían registrado en sus tarjetas de trabajo como hora de entrada

---

[15] Apéndice IV, Íd., pág. 43.

[16] Íd.

[17] Íd., pág. 44.

[18] Íd.

[19] Íd.

[20] Íd.

las 7:31 a.m. y 8:00 a.m., respectivamente.[21] Seis (6) de los trece (13) empleados que estaban en la nómina del establecimiento comercial del querellado para esa fecha, aparecían en la nómina de la panadería.[22] Finalmente, dos (2) de las empleadas que aparecían en la nómina de la panadería aparecían identificadas en las tarjetas de los empleados como cajeras, pero no se especificaba si estaban asignadas al área de supermercado o de la panadería.[23] Las cuatro (4) empleadas restantes aparecían en la nómina y en las tarjetas de empleados de la panadería.[24]

El señor Lucas Malavé Rivera solicitó la desestimación de la querella presentada ante el Departamento de Asuntos del Consumidor, alegando que le era de aplicación la exención contemplada en el Artículo 6b de la Ley para Regular las Operaciones de Establecimientos Comerciales,[25] por tener siete (7) empleados o menos para la fecha de los hechos en cada una de las dos (2) áreas de su establecimiento comercial (supermercado y panadería). Sostuvo que la panadería y el supermercado eran operaciones de negocios separados, por lo que los empleados de los mismos no debían ser considerados como una unidad para efectos del mencionado estatuto.[26]

El 9 de marzo del 2000, el Departamento de Asuntos del Consumidor de Puerto Rico emitió una resolución determinando que las violaciones imputadas habían sido cometidas por el

---

[21] Íd. Véase, además, Apéndice XI del recurso de Certiorari, pág. 174.

[22] Íd.

[23] Íd.

[24] Íd.

[25] 29 L.P.R.A. sec. 305.

[26] Apéndice IV del recurso de Certiorari, pág. 45.

señor Lucas Malavé Rivera.[27] Dicho foro administrativo concluyó que las dos (2) operaciones de negocios del querellado constituían un solo establecimiento comercial, a base de la prueba documental y testifical presentada en la vista evidenciaria.[28] Determinó que el propio testimonio del querellado apuntaba en tal dirección. El Departamento de Asuntos del Consumidor concluyó que si la parte querellada tuviera dos operaciones de negocios distintos, hubiera tenido nóminas y tarjetas de empleados separadas para los empleados del área de supermercado y los de la panadería.[29] Concluyó, además, que hubiera tributado los ingresos de ambas operaciones de negocios en planillas de contribución sobre ingresos separadas.[30] Determinó que el día de la investigación habían más de siete (7) personas empleadas en el negocio del querellado.[31] El Departamento de Asuntos del Consumidor le ordenó al querellado que cesara y desistiera de incurrir en violaciones a la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, y a la Ley de Monopolios de Puerto Rico, supra.[32] Le impuso al señor Lucas Malavé Rivera una multa administrativa ascendente a diez mil dólares ($10,000.00) y dos mil dólares ($2,000.00) por concepto de honorarios de abogado, a pagarse a favor de

---

[27] En dicha Resolución del Departamento de Asuntos al Consumidor no se dispuso nada sobre si el querellado había violado el Artículo 9 de la Ley de Monopolios de Puerto Rico, supra.

[28] Íd., pág. 46.

[29] Íd.

[30] Íd.

[31] Íd, pág. 47.

[32] Íd., pág. 48.

la Oficina de Asuntos Monopolísticos del Departamento de Justicia de Puerto Rico.[33]

Inconforme con tal determinación, el 10 de abril de 2000 el querellado presentó un recurso de revisión administrativa ante el Tribunal de Circuito de Apelaciones de Puerto Rico.[34] Alegó que el Departamento de Asuntos del Consumidor había incurrido en error al concluir que tanto el área de la panadería como la de supermercado constituían un único negocio, con trece (13) empleados en nómina, y que las actividades comerciales realizadas en el establecimiento comercial del querellado no estaban exentas del cumplimiento de las disposiciones de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra.[35] El 13 de octubre de 2000 el foro apelativo intermedio expidió el auto y confirmó la determinación de la agencia.[36] Encontró que el peticionario no había logrado derrotar la presunción de legalidad y corrección que cobija las decisiones de los organismos administrativos, por lo que la decisión recurrida debía sostenerse.[37] El peticionario radicó moción de reconsideración ante el Tribunal de Circuito de Apelaciones el 1 de noviembre de 2000,[38] la cual fue declarada no ha lugar el 13 de noviembre de 2000.[39]

---

[33] Íd.

[34] Apéndice IV del recurso de Certiorari, págs. 24-80.
[35] Íd., pág. 25.

[36] Apéndice III del recurso de Certiorari, págs. 16-23.

[37] Íd.

[38] Apéndice I del recurso de Certiorari, pág. 3.

[39] Íd., págs. 1-2.

No conforme, el peticionario acudió ante nos el 14 de diciembre de 2000, señalando la comisión por el Tribunal de Circuito de Apelaciones de los errores siguientes:

> Erró el ilustrado foro apelativo al concluir que existe evidencia sustancial para concluir que el Peticionario violó la [L]ey de [C]ierre, la de [A]suntos [M]onopolísticos y el [R]eglamento de [C]ompetencia [J]usta [N]úmero VII.

> Erró el ilustrado foro apelativo al concluir que los negocios del Peticionario eran uno solo[,] porque los ingresos provenientes de los mismos los tributaba en un [sic] misma planilla de contribución sobre ingresos.

II

La Ley para Regular las Operaciones de Establecimientos Comerciales, _supra_, constituye la coyuntura que enlaza en un estatuto los propósitos del Estado de protección social de la clase trabajadora, con la flexibilidad necesaria para ajustar las transformaciones económicas del devenir histórico puertorriqueño.[40] La intención legislativa que la animó fue múltiple. Se persiguió ofrecer a la clase trabajadora un día uniforme de descanso, mientras se ofrecía al consumidor puertorriqueño opciones más amplias para efectuar sus compras. Además, se atemperaron los Artículos 553 al 556 del Código Penal de Puerto Rico, conocidos en conjunto como la Ley de Cierre, con la legislación laboral hasta entonces adoptada por la Asamblea Legislativa de Puerto Rico.[41] La Ley para Regular las Operaciones de Establecimientos Comerciales, _supra_, permite la apertura dominical, según un horario indicado, manteniendo unas

---

[40] 1989 Leyes de Puerto Rico 701-702.

[41] Íd.

garantías y beneficios para los trabajadores que laboran ese día. De la misma manera, dicho estatuto intenta proteger a los pequeños y medianos comerciantes de la competencia de las grandes cadenas comerciales.[42] Dicha ley persigue, además, castigar las prácticas monopolísticas.

Por su parte, las disposiciones de la Ley de Monopolios de Puerto Rico, supra, y del Reglamento sobre Competencia Justa Número VII, supra, intentan combatir las prácticas comerciales injustas y monopolísticas. Específicamente, la Ley de Monopolios de Puerto Rico, supra, intenta asegurarle al pueblo de Puerto Rico en general, y a los pequeños comerciantes en particular, los beneficios de la libre competencia y evitar las concentraciones de poder económico.[43] El Reglamento sobre Competencia Justa Número VII, supra, establece, mediante un listado no taxativo, los actos que se consideran prácticas injustas de competencia. Mediante este Reglamento se intenta evitar que establecimientos comerciales incurran en actividades de negocios inescrupulosas que tienen un efecto nocivo sobre nuestra economía; muy en particular sobre aquellos comerciantes honrados que por este tipo de práctica anticompetitiva se ven forzados a cerrar sus negocios.[44]

Aclarados los propósitos que persiguen los referidos estatutos y el mencionado cuerpo reglamentario, atendemos el primer señalamiento de error levantado. El peticionario

---

[42] Véase Informe de la Comisión Especial sobre el Estudio de la Ley de Cierre de la Cámara de Representantes de Puerto Rico sobre el P. de la C. 819 de 25 de octubre de 1989, pág. 15.

[43] 1964 Leyes de Puerto Rico 248; G.G. & Supp. Corp. v. S. & F. Systs., Inc., res. el 18 de abril de 2001, 2001 TSPR 54, 153 D.P.R. ___ (2001), 2001 J.T.S. 57.

[44] Apéndice IV del recurso de Certiorari, pág. 55.

alega que el Tribunal de Circuito de Apelaciones incidió al concluir que el Departamento de Asuntos del Consumidor tenía evidencia sustancial en el expediente para determinar que se incurrió en violación a lo dispuesto por los estatutos y el reglamento antes mencionado.

Es norma reiterada que la revisión judicial de las determinaciones finales de las agencias administrativas es una de carácter limitado. La función de los tribunales se limita a determinar si la actuación de la agencia revisada no fue ultra vires, arbitraria o caprichosa.[45] Nuestra tarea consiste en constatar que las determinaciones de hechos del organismo administrativo se basan en evidencia sustancial contenida en la totalidad del expediente administrativo.[46] Si éstas sobrepasan este escrutinio judicial deben sostenerse.[47] Las agencias administrativas cuentan con la experiencia y los conocimientos altamente especializados necesarios para poner en vigor las leyes de las que son custodios.[48] Evidencia sustancial es aquella evidencia relevante que una mente razonable puede aceptar como adecuada para sostener una conclusión.[49] No basta con una mera scintilla de evidencia. Sólo intervenimos con las determinaciones fácticas de un organismo administrativo,

---

[45] López Vives v. Policía de P.R., 118 D.P.R. 219 (1987).

[46] 3 L.P.R.A. sec. 2175; Asoc. Vec. H. San Jorge v. U. Med. Corp., res. el 19 de enero de 2000, 2000 TSPR 7, 150 D.P.R. ___ (2000), 2000 J.T.S. 21; Misión Ind. P.R. v. J.P., res. el 30 de junio de 1998, 98 TSPR 86, 146 D.P.R. ___ (1998), 98 J.T.S. 79; Asoc. Drs. Med. Cui. Salud v. Morales, 132 D.P.R. 567 (1993); Silva v. Adm. Sistemas de Retiro, 128 D.P.R. 256 (1991).

[47] García Oyola v. J.C.A., 142 D.P.R. 532 (1997); Metropolitana S.E. v. A.R.P.E., 138 D.P.R. 200 (1995).

[48] Metropolitana S.E. v. A.R.P.E., supra.

[49] Misión Ind. P.R. v. J.P., supra.

cuando concluimos que las mismas no se sostienen en la evidencia que obra en la totalidad del expediente.[50] La parte que impugna las determinaciones de hecho de una agencia administrativa tiene la obligación de identificar la existencia de prueba distinta a la considerada, que reduce o menoscaba el valor probatorio de la prueba tomada en cuenta por el organismo administrativo.[51] Las determinaciones administrativas gozan de una presunción de legalidad y corrección.[52]

Las conclusiones de derecho, sin embargo, serán revisables por el Tribunal de Circuito de Apelaciones, y este Tribunal en todos sus aspectos.[53] No obstante, como regla general, le reconocemos gran peso y deferencia a las interpretaciones de un estatuto hechas por la agencia administrativa encargada de su cumplimiento.[54] La interpretación impartida al estatuto por la agencia llamada a aplicarlo no tiene que ser la única. Basta que la interpretación de la agencia sea razonable y consistente con el propósito legislativo que la animó.[55] No obstante, las conclusiones de derecho de la agencia no merecen deferencia si éstas afectan derechos fundamentales, si son irrazonables,

---

[50] <u>Domínguez v. Caguas Expressway Motors, Inc.</u>, res. el 24 de mayo de 1999, 99 TSPR 80, 148 D.P.R. ___ (1999), 99 J.T.S. 85.

[51] Íd.

[52] <u>Ramírez v. Depto. de Salud</u>, res. el 26 de marzo de 1999, 99 TSPR 42, 147 D.P.R. ___ (1999), 99 J.T.S. 47.

[53] Ley de Procedimiento Administrativo Uniforme, Sección 4.5, 3 L.P.R.A. sec. 2175; <u>Misión Ind. P.R. v. J.P.</u>, <u>supra.</u>

[54] <u>Asoc. Vec. H. San Jorge v. U. Med. Corp</u>, <u>supra</u>; <u>Misión Ind. P.R. v. J.P.</u>, <u>supra</u>; <u>Rivera v. A & C Development Corp.</u>, 144 D.P.R. 450 (1997).

[55] <u>Misión Ind. P.R. v. J.P.</u>, <u>supra.</u>

o conducen a la comisión de injusticias.[56] Tampoco ha de prevalecer la interpretación de la agencia, cuando la misma produce resultados inconsistentes o contrarios al propósito del estatuto interpretado y a su política pública.[57]

El Artículo 5 de la Ley para Regular las Operaciones de Establecimiento Comerciales, _supra_, disponía, al momento de ocurrir los hechos, lo siguiente:[58]

> Los establecimientos comerciales podrán abrir al público durante los días **domingo solamente durante el horario desde las 11:00 a.m. hasta las 5:00 p.m.** Cuando fueren domingo los días especificados en la sec. 302 ó en el inciso (b) de la sec. 303 de este título, la apertura y cierre de los establecimientos comerciales se regirá por las disposiciones contenidas en las secciones antes mencionadas.

> Los establecimientos comerciales permanecerán cerrados los domingos sin que pueda realizarse en éstos ninguna clase de trabajo fuera del horario que se establece en esta sección **excepto que una hora después de su cierre podrán realizar aquellas labores que se relacionen con la continuidad de sus operaciones y el mantenimiento de su planta física.** (Énfasis nuestro.)

La prueba presentada ante el Departamento de Asuntos del Consumidor demostró que el Supermercado Jardines de Caparra abrió al público en general el domingo 21 de agosto de 1994, a las 8:10 de la mañana, en violación a lo dispuesto por el Artículo 5 de la Ley para Regular las Operaciones de Establecimientos Comerciales, _supra_. Dicha conclusión se

---

[56] Com. Seg. P.R. v. Antilles Ins. Co., res. el 2 de abril de 1998, 98 TSPR 39, 145 D.P.R. ___ (1998), 98 J.T.S. 38 (1998).

[57] Calderón v. Adm. Sistemas de Retiro, 129 D.P.R. 1020 (1992); De Jesús v. Depto. Servicios Sociales, 123 D.P.R. 407 (1989); Costa, Piovanetti v. Caguas Expressway, res. el 29 de diciembre de 1999, 99 TSPR 187, 149 D.P.R. ___ (1999), 2000 J.T.S. 11.

[58] 29 L.P.R.A. sec. 304. El Artículo 3 de la Ley Número 212 de 31 de diciembre de 1997 enmendó esta disposición para eliminar la restricción de horario durante el cual podían realizarse las labores de mantenimiento de la planta física del establecimiento comercial, dejando esto a la discreción

sostiene en la prueba testifical presentada y en la prueba documental admitida, consistente en las tarjetas de trabajo de dos (2) empleadas del supermercado que registraron como hora de entrada las 7:31 a.m. y 8:00 a.m., respectivamente, precisamente el día en que se realizó la investigación. Esta determinación de la agencia no fue refutada por el peticionario. No obstante, el peticionario arguye que su establecimiento comercial estaba exento de las disposiciones de la Ley para Regular las Operaciones de Establecimientos Comerciales, *supra*, porque estaba organizado en dos operaciones comerciales independientes con accesos separados, siendo una de ellas una panadería, y que ambos negocios contaban para la fecha de la investigación con siete (7) empleados o menos en sus nóminas.

El Artículo 6 de la Ley para Regular las Operaciones de Establecimientos Comerciales, *supra*, contiene un listado taxativo de los establecimientos comerciales exceptuados de cumplir con los preceptos de dicha ley. La disposición estatutaria, en lo pertinente, expresa lo siguiente:[59]

> No estarán sujetos a las disposiciones sobre apertura y cierre señaladas en las secs. 302, 303 y 304 de este título los siguientes establecimientos comerciales:
>
> (a) Los operados exclusivamente por sus propios dueños, sus parientes dentro del segundo grado por [de] consanguinidad o afinidad.

---

del dueño, agente, gerente o persona encargada del negocio. Este estatuto dispuso su aplicación en forma prospectiva.

[59] 29 L.P.R.A. sec. 305. La Ley Núm. 137 de 18 de agosto de 1996 enmendó el inciso (b) del Artículo 6 de la Ley para Regular las Operaciones de Establecimientos Comerciales, *supra*, para incluir los establecimientos comerciales que son propiedad de personas jurídicas en la excepción contemplada en dicho inciso. De la misma manera, la Ley Núm. 407 de 29 de septiembre de 2000 enmendó el inciso (f) de dicho artículo para aumentar el área de venta de los establecimientos comerciales ubicados dentro de las gasolineras a trescientos cincuenta (350) metros cuadrados. Ninguna de esas enmiendas es aplicable al caso de autos.

(b) **Los que sean propiedad de personas naturales o jurídicas y que no tengan más de siete (7) empleados en su nómina semanal,** pero sujetos a las disposiciones y penalidades de las secs. 307, 308 y 310 de este título.

(c) Los ubicados en lugares dedicados exclusivamente al desarrollo de actividades culturales, artesanales, recreativas o deportivas, cuyos artículos de ventas estén relacionados con la actividad que se realiza en el lugar.

(d) **Los dedicados principalmente a la elaboración de alimentos y venta directa al público de comidas confeccionadas u otros alimentos, incluyendo restaurantes, cafés, fondas, panaderías, reposterías y empresas donde solamente se vende leche, café confeccionado, hielo, mantecados, helados o dulces.** (Énfasis nuestro.)

(e) ...

(f) ...

(g) ...

(h) ...

(i) ...

(j) ...

(k) ...

(l) ...

(m) ...

(n) ...

...

¿Le aplica alguna de las excepciones contempladas en el Artículo 6 de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, al establecimiento del querellado? Contestamos dicha interrogante en la afirmativa.

El historial legislativo de dicho estatuto nos ilustra sobre la controversia que hoy enfrentamos. El Informe de la Comisión Especial sobre el Estudio de la Ley de Cierre de la

Cámara de Representantes de Puerto Rico, supra,[60] contempló justamente la situación que tenemos ante nos para ejemplificar el alcance del último párrafo del Artículo 6, supra. El referido artículo contempla la posibilidad de que un negocio mantenga actividades comerciales exentas, conjuntamente con actividades no exentas. El Artículo 6, supra, dispone, además, lo siguiente:

> **Cuando un establecimiento comercial realice operaciones cubiertas por las excepciones de esta sección conjuntamente con operaciones sujetas a las disposiciones de las secs. 302, 303 y 304 de este título, podrá realizar solamente las operaciones exentas bajo esta sección de forma continua sin sujeción al horario establecido en las secs. 302, 303 y 304 de este título y tomará todas las precauciones que sean necesarias para impedir el acceso del público consumidor y evitar las operaciones no exentas durante las horas de cierre dispuestas en este capítulo.** El Secretario del Trabajo y Recursos Humanos tendrá facultad para vigilar y requerir el cumplimiento de esta disposición y señalará por reglamento las precauciones que deberán observarse en la situación aquí prevista. (Énfasis nuestro.)

El referido Informe de la Comisión Especial sobre el Estudio de la Ley de Cierre de la Cámara de Representantes de Puerto Rico, supra, al comentar sobre esta disposición estatutaria, expresó lo siguiente:

> Por supuesto, si en un establecimiento comercial se realizan otras actividades no exentas, el establecimiento comercial podrá operar sin las restricciones impuestas por la ley sólo en las actividades económicas exentas. Por ejemplo, si existe una combinación de colmado con cafetería o similar podrá abrir la sección de cafetería pero no la de colmado durante los días y horas que se establece para el cierre. (Énfasis nuestro.)

---

[60] El P. de la C. Núm. 819 (16 de octubre de 1989) fue el proyecto de ley que dio base a la Ley para Regular las Operaciones de Establecimientos Comerciales, supra. Véase el Informe de la Comisión Especial sobre el Estudio de la Ley de Cierre de la Cámara de Representantes de Puerto Rico, supra, a la pág. 17.

Concluimos que este curso de acción es el más sensato y apropiado para las circunstancias particulares del caso de marras. El establecimiento comercial del querellado de autos realizaba actividades exentas junto con actividades comerciales cubiertas por la Ley para Regular las Operaciones de Establecimientos Comerciales, supra. Así lo determinó la agencia administrativa recurrida en sus determinaciones de hecho. El Departamento de Asuntos del Consumidor concluyó que el Supermercado Jardines de Caparra se dedicaba al **negocio de panadería** y **a la venta de comestibles**. Una panadería, por disposición expresa de ley, está exenta de las horas de apertura y cierre contempladas en el Artículo 5, supra. **No obstante, el Artículo 6 de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, le impone al dueño del establecimiento comercial, que realiza actividades comerciales mixtas, la obligación de tomar todas las precauciones que sean necesarias para impedir el acceso del público consumidor al área restringida y así evitar que se realicen operaciones no exentas durante las horas de cierre establecidas por ley. Quedó demostrado que el querellado no tomó ninguna precaución, ya que los clientes recorrían todas las áreas del establecimiento comercial libremente.** Concluimos que el querellado violó las disposiciones de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, al no tomar ninguna precaución y realizar una actividad comercial no exenta en las horas restringidas. No podemos avalar la alegación del peticionario relativa a que el área de supermercado contaba con siete (7) empleados o menos y, por lo tanto, estaba exenta de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, por

virtud de la excepción contemplada en el Artículo 6(b) de la misma. Quedó establecido por la prueba examinada por la agencia, que el 21 de agosto de 1994, dos (2) de las empleadas que ejercían funciones de cajera y que aparecían en la nómina de la panadería, laboraron ese día. No obstante, de sus tarjetas de asistencia no se desprende en que área laboraron. De la prueba estipulada surge que de las tarjetas de los demás empleados surgía el área de trabajo en que laboraban. Sin embargo, esas dos (2) empleadas ejercían sus funciones, sin distinción, entre el área de la panadería y la del supermercado.[61]

El peticionario alega, y la Mayoría acoge su argumento, a los efectos de que para que el Departamento de Asuntos del Consumidor pueda establecer una infracción a lo dispuesto en el Artículo 5 de la Ley para Regular las Operaciones de los Establecimientos Comerciales, supra, **tiene que demostrar con prueba directa o circunstancial que efectivamente se realizó la venta de artículos no exentos.** No compartimos tal criterio. **No podemos avalar la posición Mayoritaria que establece que es necesario demostrar la venta de un artículo no exento para que se configure una violación al estatuto.** Entendemos que es suficiente con establecer que el área no exenta estaba abierta o expuesta al público fuera de las horas permitidas para que se infrinja lo dispuesto en los Artículos 5 y 6 del referido estatuto, supra. **Surge claramente de la transcripción de la vista administrativa, que una de las cajas registradoras del área de supermercado estaba abierta al público general antes de las horas permitidas, y que los**

---

[61] Apéndice IV del recurso de Certiorari, pág. 44; Apéndice XI, Íd., págs. 169-173.

**consumidores discurrían libremente por las góndolas de esa área del establecimiento comercial.**[62]

El peticionario levanta como segundo señalamiento de error que el Tribunal de Circuito de Apelaciones incidió al concluir que las operaciones de negocios del querellado constituían un solo establecimiento comercial, fundamentándose en que la Planilla de Contribución sobre Ingresos del peticionario registraba ambas actividades comerciales en un solo informe y no separadamente. Éste constituyó uno de los fundamentos utilizados por el Departamento de Asuntos del Consumidor para formular su decisión final. No compartimos tal criterio. Concluimos que era innecesario, para evaluar y adjudicar la controversia de autos, utilizar dicho criterio para llegar a una determinación sobre si las violaciones imputadas se cometieron. Las circunstancias fácticas del caso de autos, producto de la investigación inicial, eran suficientes para establecer que se cometieron infracciones a la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, y a la Ley de Monopolios de Puerto Rico, supra. La Ley de Contribuciones sobre Ingresos de 1954,[63] y el Código de Rentas Internas de Puerto Rico de 1994,[64] no contienen disposición legal alguna que obligue a una persona natural a radicar una Planilla de Contribución sobre Ingresos

---

[62] Apéndice IX, Íd., pág. 157.
[63] Ley Núm. 91 de 29 de junio de 1954, derogada.

[64] Ley Núm. 120 de 31 de octubre de 1994, 13 L.P.R.A. sec. 3001 et seq.

separada por cada operación de negocios que realice esa persona como comerciante individual.[65]

III

El Artículo 11 de la Ley para Regular las Operaciones de Establecimientos Comerciales, <u>supra</u>, contempla dos cauces a seguir para la tramitación de las infracciones a las disposiciones de dicho estatuto. El referido artículo disponía, al momento de ocurrir los hechos que dan base a la querella, lo siguiente:[66]

> Cada infracción a las disposiciones de este Capítulo constituirá un delito menos grave que será castigado con multa que no será menor de **cinco mil (5,000) dólares ni mayor de cincuenta mil (50,000) dólares o pena fija de reclusión por un término de un (1) año o ambas penas a discreción del tribunal**. En caso de mediar circunstancias agravantes, la pena de reclusión será aumentada a tres (3) años y de mediar circunstancias atenuantes la pena de reclusión será reducida a seis (6) meses. Las personas acusadas por infringir las disposiciones de este Capítulo tendrán derecho a juicio por jurado. Cada violación a las disposiciones de este Capítulo cometida en una unidad o tienda del establecimiento constituirá una violación distinta y separada.

> Toda infracción a las disposiciones de este Capítulo constituirá además **una práctica o método injusto y desleal de competencia. En estos casos la Oficina de Asuntos Monopolísticos podrá radicar y tramitar la correspondiente querella ante el Departamento de Asuntos al Consumidor a tenor con lo dispuesto en la sec. 259 del Título 10.** El Departamento de Asuntos del Consumidor impondrá a los violadores de la ley multas administrativas que **no serán menores de cinco mil (5,000) dólares ni mayores de cincuenta mil (50,000) dólares,** las cuales ingresarán al Fondo Especial creado por la sec. 1016 del Título 23, para fortalecer los recursos disponibles de la Oficina de Asuntos Monopolísticos para asegurar el cumplimiento de este Capítulo y para sufragar el costo de programas

---

[65] 13 L.P.R.A. 3022 (derogado), 13 L.P.R.A. sec. 8422.

[66] 29 L.P.R.A. sec. 310.

de entrenamiento y mejoramiento profesional de sus funcionarios. (Énfasis nuestro.)

Es necesario aclarar que dicho artículo fue enmendado posteriormente a los hechos de este caso por la Ley Núm. 212 de 31 de diciembre de 1997,[67] la cual rebajó las penalidades a imponerse por razón de las infracciones a las disposiciones de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra. Dicha ley no dispuso para su aplicación retroactiva.[68]

Por disposición expresa del Artículo 11, supra, toda infracción a la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, constituye un método desleal e injusto de competencia. A tenor con dicha disposición, la Oficina de Asuntos Monopolísticos podía radicar y tramitar la querella mediante el cauce administrativo, imponiéndose, de ser procedente, una multa administrativa mínima de cinco mil dólares ($5,000) y máxima de cincuenta mil dólares ($50,000).

Una vez probado que el peticionario abrió al público su establecimiento comercial el domingo 21 de agosto de 1994, fuera de las horas especificadas por ley, y que no tomó precaución alguna para evitar el acceso del público al área de supermercado, el Departamento de Asuntos del Consumidor no podía sino concluir que el Artículo 3(a) de la Ley de Monopolios de Puerto Rico[69] se había infringido. En reiteradas

---

[67] 29 L.P.R.A. sec. 302 et seq.

[68] Véase, además, E.L.A. v. Frig. y Alm. del Turabo, Inc., res. el 28 de agosto de 2001, 2001 TSPR 120, 155 D.P.R. __ (2001), 2001 J.T.S. 125.

[69] 10 L.P.R.A. sec. 259(a). El Artículo 3(a) de la Ley de Monopolios de Puerto Rico dispone lo siguiente:

ocasiones hemos expresado que las agencias gozan de una amplia discreción en cuanto a la imposición de sanciones.[70] Nuestra revisión en este ámbito se limita a evaluar si la actuación de la agencia al imponer la sanción fue irrazonable o ilegal.[71] Estimamos que la multa impuesta por el Departamento de Asuntos del Consumidor no fue irrazonable o excesiva.

Concluimos, además, que la actuación del peticionario de operar el área de supermercado fuera del horario permitido en ley constituyó una infracción al Artículo III y al Artículo IV, inciso 32, del Reglamento sobre Competencia Justa Número VII, supra. El Artículo III del referido reglamento proscribe toda práctica o conducta que constituya una violación a cualquier legislación antimonopolística vigente o cualquier conducta que viole las disposiciones estatutarias que regulan o afectan el comercio o la competencia. Reiteramos que el Artículo 11 de la Ley para Regular las Operaciones de Establecimientos Comerciales, supra, establece que toda infracción a las disposiciones de ese estatuto constituirá una práctica injusta y desleal de competencia. Por su parte, el Artículo IV del referido Reglamento establece, en su inciso 32, que cualquier actuación que constituya una violación a los estatutos que disponen sobre los horarios y días en que deben operar los establecimientos comerciales en Puerto Rico se considerará un método injusto de competencia. La actuación del peticionario infringió las disposiciones de la Ley para

---

(a) Los métodos injustos de competencia, así como las prácticas o actos injustos o engañosos en los negocios o el comercio, por la presente se declaran ilegales.

[70] E.L.A. v. Frig. y Alm. del Turabo, Inc., supra.

[71] Íd.

Regular las Operaciones de Establecimientos Comerciales, supra, que regula el horario de operaciones de negocios de aquellos establecimientos comerciales cubiertos por dicho estatuto. Por lo tanto, infringió el referido Artículo III, supra, e incurrió en los métodos injustos de competencia a que hace alusión el mencionado Artículo IV, supra.

Los honorarios de abogado impuestos al peticionario por el Departamento de Asuntos del Consumidor no son procedentes. La sección 1 de la Ley Núm. 10 de 20 de marzo de 1972,[72] establece que la imposición de costas y de honorarios de abogado sólo es procedente en las acciones que para la protección de los consumidores insten el Departamento de Asuntos del Consumidor y la Oficina de Asuntos Monopolísticos del Departamento de Justicia ante el Tribunal de Primera Instancia de Puerto Rico y la Corte de Distrito de Estados Unidos para Puerto Rico.[73] La Oficina de Asuntos Monopolísticos presentó la querella ante una agencia administrativa, por lo que resulta improcedente la imposición de honorarios de abogado al querellado.[74]

IV

Por los fundamentos antes expuestos, revocaríamos la determinación de la agencia recurrida que dispuso que el aquí peticionario incurrió en violación a los estatutos antes indicados y al Reglamento sobre Competencia Justa Núm. VII, supra, por el hecho de operar, el día y la hora establecida, el área de panadería de su establecimiento comercial;

---

[72] 23 L.P.R.A. sec. 1016(a).

[73] E.L.A v. Frig. y Alm. del Turabo, Inc., supra.

revocaríamos la determinación de la agencia recurrida de imponerle al peticionario el pago de honorarios de abogado; y confirmaríamos el resto de la sentencia recurrida.


**Efraín E. Rivera Pérez**
**Juez Asociado**

---

[74] Íd.