*1177 TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos el Sr. Roberto Díaz Fernández (Sr. Díaz Fernández o el recurrente), mediante el recurso de epígrafe. Nos solicita que revoquemos la Resolución emitida por la Junta de Síndicos (la Junta de Síndicos) de la Administración de los Sistemas de Retiro de los Empleados de Gobierno y la Judicatura (la Administración o la recurrida) el 15 de junio de 2009 y notificada el 8 de julio de 2009. Por medio de esta última, la Junta de Síndicos confirmó la decisión de la Administración de denegar la solicitud del recurrente para que se le concedieran los beneficios de una pensión por incapacidad ocupacional.
Habiendo examinado cuidadosamente el presente recurso y el expediente administrativo que obra ante nuestra consideración, resolvemos confirmar la resolución recurrida.
Antes de discutir las razones en las cuales fundamentamos nuestra determinación, hacemos un recuento procesal del caso de epígrafe.
I
El Sr. Díaz Fernández, de cincuenta y nueve años de edad, cotizó para la Administración desde el 18 de diciembre de 1978, para un total de 26.50 años. Su último trabajo fue en el Departamento de Hacienda, en donde ocupaba un puesto como Especialista en Contribuciones II.
El recurrente sufrió varios accidentes laborales por los que se reportó a la Corporación del Fondo del Seguro del Estado (en adelante, CFSE) para recibir tratamiento. Reseñamos a continuación cada uno de éstos, según surge de la resolución recurrida:
“(1) Caso Núm. 94-13-00925: accidente sufrido el 3 de septiembre de 1993. La CFSE relacionó el caso con un esguince en la muñeca y la mano izquierda.
(2) Caso Núm. 98-13-45631-6: accidente sufrido el 8 de abril de 1998. La CFSE relacionó el caso emocional.
(3) Caso Núm. 99-13-35548-2: accidente sufrido el 9 de marzo de 1999. La CFSE relacionó el caso por esguince dorso lumbar; y
(4) Caso Núm. 02-13-3: el recurrente acudió a la sala de emergencia el 19 de marzo de 2002 y estuvo hospitalizado seis días; allí le diagnosticaron sinusitis crónica. Posteriormente, la CFSE relacionó el caso con rinitis alérgica.”
El 4 de diciembre de 2004, el recurrente presentó una solicitud de pensión por incapacidad ocupacional ante la Administración. Mediante resolución de 28 de junio de 2005, la Administración denegó dicha solicitud. En su determinación, la recurrida concluyó que el Sr. Díaz Fernández no estaba total y permanentemente incapacitado para cumplir con los deberes inherentes a su cargo, según asignados por su patrono. Además, sostuvo que las condiciones no ocupacionales que padece el recurrente no pueden considerarse, porque éste no tiene cotizado en *1178 el Sistema de Retiro un mínimo de diez años.
Inconforme con esta determinación el Sr. Díaz Fernández apeló ante la Junta de Síndicos el 21 de julio de 2005 (Caso Núm. 2005-0568). La Junta de Síndicos devolvió el caso a la Administración para que evaluara la condición de asma bronquial padecida por el recurrente. Habiendo cumplido con la orden de la Junta, por medio de resolución emitida el 28 de enero de 2008, la Administración se reiteró en la determinación anterior y denegó la solicitud de incapacidad ocupacional.
El 13 de febrero de 2008, el recurrente presentó una segunda apelación ante la Junta de Síndicos. La Administración contestó la apelación el 13 de junio de 2008 y la vista en los méritos se celebró el 2 de octubre de 2008.
El recurrente presentó como prueba testifical su propio testimonio. Declaró que le daban dolores en la muñeca de la mano izquierda par de días en la semana o en el mes puede darle cinco o seis días, que no podía hacer mucha fuerza con esa mano, que se le caen los objetos pesados. Testificó que era diestro, que podía levantar un galón de leche con la mano izquierda, pero con dificultad. No obstante, declaró que el tratamiento médico se lo daba él mismo, se aplica un ungüento dominicano llamado “Flecha” que le alivia bastante y rápidamente. Transcripción de la vista administrativa, págs. 8-9.
En cuanto al dolor de espalda baja, declaró que alguna vez había tomado terapia física, pero no se podía acordar cuándo fue eso, como tampoco la cantidad de tratamientos que recibió. Explicó que luego de recibir las terapias siente alivio del dolor por varios meses y si le vuelve el malestar va al fisiatra. No pudo recordar el nombre del fisiatra que visita ni tampoco la fecha en que se atendió con uno. Al igual que con el dolor de la mano, el recurrente se alivia cuando se aplica el ungüento “Flecha” que sirve para todo eso y él siempre lo tiene, se frota con él y se mejora. No le dan dolores todos los días de la semana, es un dolor que le da esporádicamente, pero no todos los días. Para estos dolores toma Motrin 800 mg y Dologesic que las adquiere sin receta en la farmacia. Transcripción de la vista administrativa, págs. 10-13.
Sobre sus condiciones respiratorias, testificó que la alergia lo tiene mal, que siente dificultad para respirar y a veces le falta hasta el oxigeno, que tiene que visitar constantemente al neumólogo y que si le dan ataques de asma a veces, ha tenido que ir a la sala de emergencia, la última vez el 7 de enero de 2008. Utiliza par de veces a la semana un inhalador en aerosol a presión (bomba para el asma), pero no se recordaba del nombre de la medicina. No le han recetado terapias respiratorias por el momento. Declaró que caminaba a paso de hormiga porque se asfixiaba y si subía escaleras se sentía con el corazón en la boca. No obstante, testificó que utilizaba perfume todos los días, que utilizaba detergentes comunes y corrientes para limpiar la casa y que no le agravaban los síntomas respiratorios, excepto el cloro. El polvo del Sahara, las cenizas del volcán Soufriére y la bruma del ambiente sí le producen alergia y asma, por lo que se tiene que quedar encerrado. Transcripción de la vista administrativa, págs. 15-16, 18-19.
Por último, declaró que la condición emocional lo está matando, porque tiene el ánimo mal y se pasa encerrado en su cuarto con el aire acondicionado puesto, le da mucho sentimiento, llora, oye voces que le dicen cosas malas y hace un año intentó suicidarse, pero un tío suyo que vive cerca hizo que recapacitara y lo llevó al Hospital Panamericano y allí estuvo tres o cuatro días internado. También estuvo en hospitalización parcial en INSPIRA. Le cuesta mucho trabajo guiar porque siempre está irritado y se pone a pelear con toda la gente, por eso, su hijo lo lleva, o se va en carro público, lo cual es muy malo debido a que él ocupa mucho espacio en los carros y tiene que esperar mucho tiempo. Asimismo, explicó que a causa de la ansiedad que le provoca la depresión ha aumentado 70 ó 80 libras que no ha podido bajar porque se pasa comiendo bizcochos, dulces, frituras y otra picadera. Transcripción de la vista administrativa, págs. 20-21, 25-26.
No puede dormir bien, se pasa las noches mirando el techo y si no fuera por las medicinas no lo haría. No *1179 tiene pasatiempo alguno, ni tiene la costumbre de leer, porque no le gusta, a veces, hojea algún periódico o una revista. No ve televisión porque sólo dan malas noticias de matanzas e historias así. Si tiene necesidad de comprar algún producto básico como leche o pan lo compra en negocios pequeños cerca de su casa, pero sus cosas personales las obtienen en el centro comercial Las Catalinas. Le gusta ir allí porque ve gente y se entretiene un rato. Transcripción de la vista administrativa, págs. 28, 30-31.
En lo atiente a su trabajo, declaró que cuando le empezó la depresión se tardaba más en trabajar los casos y le costaba mucho trabajo hacer los viajes de campo para las investigaciones porque no tenía paciencia para guiar a lugares lejos. Además, no podía escribir los informes mensuales a tiempo y se le atrasaba aunque ya había terminado la investigación. Transcripción de la vista administrativa, págs. 31-32.
Como prueba documental, se presentaron los siguientes documentos:
“(1) Copia de expedientes médicos del apelante en la CFSE.
(2) Informe de evaluación sicológica de 5 de mayo de 1998 en el cual se hizo una impresión diagnóstica de reacción de ajuste con características mixtas;
(3) Informe médico del siquiatra Ramón O. Fortuño Ramírez de 24 de octubre de 2001 en el cual se diagnosticó trastorno adaptativo con ánimo mixto.
(4) Certificación de hospitalización en el Sistema San Juan Capestrano de 3 de junio de 2002.
(5) Informe médico especial del siquiatra José Berrios de 5 de junio de 2003 en el cual se diagnosticó depresión mayor recurrente.
(6) Informe médico especial por el doctor Pedro López Valentín de 10 de septiembre de 2003 en el que se diagnosticó depresión mayor recurrente moderada con prognosis buena.
(7) Informe sobre evaluación interdisciplinaria y evaluación médica siquiátrica del doctor Paredes de 8 de agosto de 2004 en el cual se diagnosticó depresión mayor severa recurrente sin psicosis.
(8) Notas de progreso del Centro de Medicina Pulmonar del doctor Julio Candelario Lanza realizado en el año 2004.
(9) Notas de progreso y tratamiento de Soto Internal Medicine Services PSC en el cual se indica que el recurrente padece de disnea y fatiga muscular, pero los pulmones están en buen estado.
(10) Certificado médico del cardiólogo Pedro J. Colón Ortiz de 14 de octubre de 2004 en el que se reseñan las condiciones médicas que padece el recurrente, a saber: diabetes mellitus tipo 2, hipertensión arterial, osteoartritis, ansiedad crónica por depresión, para las cuales toma los siguientes medicamentos: Ambien, Avapro 300 mg., Norvasc 10 mg., Zyrtec, insulina, Glucophage 850 mg. y Lasix 20mg. La impresión diagnostica fue depresión crónica y ansiedad, sinusitis y osteoartritis.
(11) Informe médico sobre diabetes del doctor Francisco Carballo de 20 de octubre de 2004. El doctor Carballo atiende al recurrente desde el 20 de septiembre de 1993 y reseñó el historial médico del recurrente: diabetes mellitus tipo 2, hipertensión arterial, obesidad mórbida, sinusitis crónica, cardiopatía isquémica, sangrado gastrointestinal y úlcera péptica. Además, padece de neuropatía periférica con fuerza muscular 4/5 y reflejos positivos y la prognosis es reservada.
*1180 (12) Informe médico cardiovascular de 3 de marzo de 2005. En la resolución recurrida se indicó que el informe es casi ilegible, incluido el nombre del médico. Aún así, del mismo se desprende que el recurrente pesa 314 libras con una estatura de cinco pies y ocho pulgadas (5’.8”), tiene un historial de diabetes mellitus, obesidad, rinopatía y dolor de pecho que irradia hacia las manos cuyo factor precipitante es el estrés. No hay historial de síncope cardiaco ni arritmia y la prognosis es reservada.
(13) Informe por el siquiatra doctor Caballero de 26 de marzo de 2005 en el que se hizo una impresión diagnóstica de depresión mayor severa recurrente. El doctor Caballero concluyó que el recurrente está capacitado para administrar sus bienes económicos y autosuficiente para ir a la oficina por sí mismo.
(14) Revisión médica por la doctora Yarina Marucci Ramos de 6 de agosto de 2005. En esta revisión se evaluaron todas las condiciones médicas ocupacionales y no ocupacionales del recurrente (diabetes mellitus tipo 2, úlcera péptica, enfermedad coronaria, insuficiencia periférica vascular, obesidad y neuropatía diabética). Luego de analizar toda la evidencia médica, se determinó que el recurrente no satisface los criterios 1.13 (lesiones al tejido blando) ni 3.03 (asma) del Manual para ser beneficiario de una pensión ocupacional. Como tampoco, los criterios 4.02 (fallo cardiaco crónico), 4.03 (enfermedad cardiovascular hipertensiva), 4.04 (enfermedad isquémica cardiaca), 4.11 (insuficiencia venosa crónica de una extremidad inferior), 4.12 (enfermedad arterial periferal), 5.04 (enfermedad de ulcera péptica), 6.02 (fallo renal), 9.08 (diabetes mellitus), ni 9.09 (obesidad).
(15) Revisión médica del expediente por el siquiatra Alfredo Hurtado de Mendoza de 16 de junio de 2005. El doctor Hurtado de Mendoza concluyó que el recurrente no satisfacía los requisitos de severidad contemplados en el criterio 11.04 (trastornos afectivos) para calificar para recibir incapacidad ocupacional emocional. Tras haber emitido su revisión recibió información adicional y concluyó que la nueva evidencia no documentaba sintomatologia severa incapacitante que cumpliera con los requisitos listados en los criterios 11.04 y 11.06 (trastornos relacionado con la ansiedad).
(16) Certificación de estadía en el sistema San Juan Capestrano de Río Piedras de 27 de septiembre de 2007. El resumen del alta del hospital señala que el recurrente estuvo hospitalizado del 23 de agosto de 2007 al 29 de agosto de 2007 y fue diagnosticado con depresión mayor severa con rasgos sicóticos. Además, tiene un historial médico de diabetes mellitus, infarto, neuropatía y ulcera duodenal. Se le recetó Wellbutrin 150mg, Prozac 40mg, Seroquel 400mg y Restoril 30mg.
(17) Revisión médica del doctor Abimael Rivera García de 7 de noviembre de 2007. En esta revisión, luego de hacer una evaluación longitudinal del expediente del recurrente, se concluye que no cumple con los criterios de severidad del inciso 11.04.
(18) Revisión médica del doctor Vicente Sánchez Quiles de 27 de noviembre de 2007 que concluyó que tras haber examinado toda la evidencia médica disponible, el recurrente no satisface los criterios 1.05 (desórdenes de espina vertebral) 10.08 (problemas de médula), como tampoco 10.14 (neuropatías periféricas). Así tampoco se documentan lesiones de tejidos blandos, ni daños a los órganos efectores de acuerdo con los criterios 9.08 (diabetes mellitus) y 4.03 (enfermedad cardiovascular hipertensiva). No existen complicaciones con la enfermedad coronaria, como se especifican en el criterio 4.04 (enfermedad isquémica cardiaca) y sus distintos apartados. Tampoco satisface los criterios de los estándares 4.03, 4.04, 9.08, ni ningún otro, como tampoco ninguna de sus combinaciones para que se haga una determinación de incapacidad no ocupacional.
(19) Copia del expediente médico del Hospital HIMA-San Pablo de Caguas, Sala de Emergencia, de 6 de enero de 2008, el cual es ilegible y lo único que se entiende es que el recurrente tenía esputo amarillo.
(20) Revisión médica del siquiatra Abimael Rivera García de 28 de enero de 2008 que concluyó que luego de *1181 hacer una revisión longitudinal del expediente incluida la última hospitalización del recurrente, éste no satisfacía con los criterios de severidad establecidos en el criterio 11.04 (trastornos afectivos).
(21) Certificado médico del neumólogo Juan J. Candelario Lanza de 26 de septiembre de 2008 del cual sólo se puede leer una lista de los medicamentos que toma el recurrente.
(22) Certificado médico del doctor David Flores Santa de 10 de enero de 2008 en el cual se señala que el recurrente toma Prozac, Seroquel, Klonopin, Restoril y Bupro(ilegible).”
El 8 de julio de 2009, la Junta de Síndicos emitió la resolución recurrida en la cual determinó que el recurrente no está incapacitado por las condiciones orgánicas, sean músculoesqueletales o neurológicas. En cuanto a su condición emocional, la recurrida concluyó que el recurrente siempre ha exhibido un comportamiento y comunicación efectiva, coherente, lógica y relevante y que, durante años, sus síntomas fueron descritos como moderados y no permanentes. Aclaró que sólo, a partir de 2004, cuando el recurrente empezó tratamiento con el doctor Paredes, es que se han alegado síntomas graves. No obstante, señaló que según surge del propio testimonio del recurrente su comportamiento no es compatible con estos síntomas, ya que éste tiene gran interés en su tratamiento, busca ayuda profesional y reconoce los estresores que lo pueden llevar a una crisis. Además, el recurrente se interesa por la vida de su hijo, le gusta salir a lugares públicos, como centros comerciales y es capaz de entretenerse. Determinó que el recurrente tiene capacidad para administrar sus bienes económicos y hacer metas abstractas que puede llevar a la realidad mediante compromiso y responsabilidad y que no padece de ataques de pánico, ni tiene temores irracionales. En conclusión, sostuvo que de la evidencia médica que surge del expediente y de las condiciones médicas relacionadas por la CFSE, no existe prueba que amerite que se incapacite al recurrente.
Inconforme con determinación de Junta, el 27 de agosto de 2009, el señor Díaz Fernández presentó el recurso de epígrafe y formula los siguientes señalamientos de error:
“Primer Error
Erró la Honorable Junta de Síndicos al denegar la pensión por incapacidad ocupacional al interpretar, restrictivamente la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, descartar o no considerar decisiones o resoluciones, evidencia médica más reciente, considerar evidencia médica remota, omitir hechos esenciales que surgen de las evaluaciones médicas como incapacitantes e incluirlos de forma incompleta para sostener una decisión de no incapacidad, así como emitir una decisión evaluando [sic] condiciones aisladamente, y no si el conjunto de dos o más de esas condiciones (emocional y orgánica relacionadas por el FSE) eran incapacitantes conforme lo establece la reglamentación aplicable en estos casos.
Segundo Error
Las conclusiones de derecho son contrarias a los hechos probados, dejando [sic] de incluir hechos esenciales, conforme al reglamento aplicable.
Tercer Error
La Junta de Síndicos incurrió en abuso de discreción y arbitrariedad al emitir una decisión inconsistente con otras previamente emitidas con similares hechos.
Cuarto Error
Erró la Honorable Junta de Síndicos al confirmar la decisión sobre denegatoria de pensión por incapacidad *1182 ocupacional que resolvía que el recurrente aún estaba físicamente y mentalmente capacitado para trabajar, sin considerar factores vocacionales y funcionales, sin que se evaluaran los trabajos que puede desempeñar, y sin tomar en consideración que el recurrente está fuera del servicio desde el 2004 por incapacidad disfrutando de pensión por incapacidad del Seguro Social.”
El 12 de febrero de 2010, por conducto de la Oficina de la Procuradora General, la Administración presentó Escrito en Cumplimiento de Orden.
Con el beneficio de la comparecencia de las partes y la transcripción de la vista en los méritos celebrada el 2 de octubre de 2008, resolvemos.
n
A
El control judicial de las actuaciones administrativas garantiza que los ciudadanos tengan un foro a donde recurrir para vindicar sus derechos y obtener un remedio frente a los organismos administrativos. Esto a su vez impone una obligación especial a los tribunales de ser especialmente cuidadosos en revisar las decisiones en este campo para proteger la ciudadanía contra posibles actuaciones arbitrarias. Assoc. Ins. Agencies, Inc. v. Com. Seg. de P.R., 144 D.P.R. 425, 435 (1997); Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 223-224 (1974).
Es un principio firmemente establecido que a toda determinación administrativa le cobija una presunción de regularidad y corrección. Por eso, la revisión judicial de este tipo de decisiones se circunscribe a determinar si la actuación de la agencia es arbitraria, ilegal, o tan irrazonable que la misma constituye un abuso de discreción. Otero v. Toyota, 163 D.P.R. 716 (2005); Pacheco v. Estancias de Yauco, 160 D.P.R. 409 (2003); E.L.A. et als. v. Malavé, 157 D.P.R. 586 (2002); Mun. de San Juan v. J.C.A., 149 D.P.R. 263 (1999); Franco v. Depto de Educación, 148 D.P.R. 703 (1999).
No obstante, el que los tribunales den un alto grado de deferencia a los dictámenes de las agencias no significa una abdicación de la función revisora del foro judicial. Rivera Concepción v. A.R.P.E., 152 D.P.R. 116, 122 (2000); Del Rey v. J.A.C.L., 107 D.P.R. 348 (1978). Por el contrario, los tribunales tienen el deber de proteger a los ciudadanos contra posibles actuaciones ultra vires, inconstitucionales o arbitrarias de las agencias. Las determinaciones de los foros administrativos no gozan de deferencia cuando éstos actúan de manera arbitraria, ilegal, irrazonable o ante la ausencia de prueba adecuada o cuando la agencia cometió error manifiesto en la apreciación de la misma. Comisionado v. Prime Life., supra; Torres v. Junta Ingenieros, supra; O.E.G. v. Rodríguez, 159 D.P.R. 98 (2003).
Por otro lado, el Tribunal Supremo ha expresado que “los tribunales tenemos el deber de fiscalizar rigurosamente las decisiones de dichas agencias, para asegurar que desempeñen cabalmente sus importantísimas funciones, y para que el País no pierda la fe en sus instituciones de gobierno.” Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 700 (2000).
Así, la revisión judicial de decisiones administrativas tiene como fin primordial delimitar la discreción de los organismos administrativos para asegurar que éstos ejerzan sus funciones conforme la ley y de forma razonable. Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 279 (1999).
Sin embargo, en cuanto a las conclusiones de derecho que no envuelven interpretaciones de las leyes y reglamentos que administra la agencia cuya decisión es impugnada ni dentro del área de especialidad de ésta, las mismas son revisables por los tribunales sin limitaciones. Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998); Rivera Rentas v. A & C Development, supra.
*1183 B
Por otro lado, mediante la aprobación de la Ley Núm. 447 del 15 de mayo de 1951, 3 L.P.R.A. sees. 761 et seq. (la Ley Núm. 447), la Asamblea Legislativa creó un sistema de retiro y beneficios para la gran mayoría de los empleados gubernamentales del país. Al tenor de lo establecido en la mencionada legislación, prácticamente todos los empleados del servicio público están obligados a participar de dicho sistema, quedando así sujetos a las disposiciones de la misma. Pérez et als. v. Depto. de la Familia, 156 D.P.R. 223, 230 (2002); Calderón v. Administración de los Sistemas de Retiro, 129 D.P.R. 1020, 1031-1032 (1992); Morales Vda. de Cortés v. Administración de los Sistemas de Retiro, 123 D.P.R. 589, 595 (1989).
Ahora bien, en cuanto a los criterios para la concesión de pensiones por incapacidad a empleados del servicio público, los artículos 9, 10 y 11 de la Ley Núm. 447 disponen en lo pertinente:
“Artículo 9
Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que:
(a) Se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador.
[...]
(c) El Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo.
(d) El participante tendrá que radicar la solicitud, sustentada con suficiente prueba médica, dentro de los ciento ochenta (180) días en que se relacione la condición por la cual radica su solicitud.
Artículo 10
Todo participante que, teniendo por lo menos 10 años de servicios acreditados, se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, tendrá derecho a una anualidad por incapacidad no ocupacional [...].
Artículo 11
Para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica conforme a los criterios que mediante reglamento fije el Administrador y que dicha prueba revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado [...].”
Conforme lo dispone la Ley Núm. 447, con el propósito de poner en vigor las disposiciones de la mencionada legislación, la Administración adoptó el Reglamento para la Concesión de Pensiones por Incapacidad a lo(a)s Participantes de los Sistemas de Retiro de lo(a)s Empleado(a)s del Gobierno y la Judicatura, Núm. 6719 del 6 de diciembre de 2003 (el Reglamento 6719). El Artículo 6 del mencionado Reglamento establece los requisitos a cumplirse para ser acreedor de una pensión por incapacidad ocupacional. En lo pertinente, ésta establece como requisitos:
*1184 “Sección 6.2
A. Todo(a) participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado(a) para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional. Para tener derecho a una pensión por incapacidad ocupacional bajo este Artículo, será requisito que el participante:
(1) Sea participante activo(a) a la fecha en que ocurre el accidente por el cual solicita una anualidad por incapacidad ocupacional;
(2) La Corporación del Fondo del Seguro del Estado (CFSE) determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo, a tenor con lo dispuesto por la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley 45 del 18 de abril de 1935, según enmendada;
(3) Radique su solicitud dentro de los ciento ochenta (180) días en que la CFSE emita dicha determinación;
(4) Se reciba la Certificación de Compensabilidad para la Administración, (modelo CFSE 0037, Abr. 2002) que emitirá la Corporación del Fondo del Seguro del Estado, sobre el accidente por el cual solicita la incapacidad ocupacional;
(5) Se reciba suficiente evidencia médica;
(6) Cumpla con la Sección 6.1 de este Reglamento. [1] [...]
Sección 6.3
A. Todo(a) participante que se inhabilitare para el servicio, debido a un estado mental o físico y que, por razón de ese estado, estuviere incapacitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, tendrá derecho a una anualidad por incapacidad no ocupacional. Para tener derecho a una pensión por incapacidad no ocupacional bajo este Artículo, será requisito que el participante:
(1) Se encuentre en servicio activo a la fecha de radicación de la solicitud;
(2) Tenga por lo menos diez (10) años de servicios acreditados;
(3) Cumpla con la Sección 6.1 de este Reglamento. [...]
Con el propósito de establecer las normas para adjudicar las reclamaciones del beneficio de incapacidad a sus participantes, utilizará los criterios establecidos en el Manual para la Evaluación de Incapacidad (en adelante, Manual) que se incluye como Apéndice del Reglamento 6719. El Manual contiene los códigos médicos con el grado de severidad y hallazgos médicos requeridos para determinar si existen las condiciones físicas o mentales, o ambas, que, por su naturaleza, resultan incapacitantes. Además, provee las normas aplicadas durante el proceso de evaluación de determinación de incapacidad.”
La Parte I (C) del Manual dispone, en lo pertinente, que:
“Se considera evidencia médica aceptable, toda aquella presentada por las fuentes de tratamiento del reclamante, ya sea copia de expedientes médicos, de hospitalizaciones o cuestionarios provistos por la Administración, además de todo estudio, resultado de laboratorio o examen mental concerniente a los *1185 diagnósticos, alegaciones y quejas del reclamante.
Las opiniones o decisiones de incapacidad emitidas por otras fuentes, no obligan a la Administración a otorgar una incapacidad.” [Destacado en el original]
Finalmente, la Parte I (D) del Manual establece los criterios para el proceso de evaluación médica:
1. Se evaluará la evidencia, según los criterios establecidos en los Códigos Médicos, si:
a. llena los requisitos de los mismos; o
b. si iguala los requisitos. Se entiende por igualar, si:
1. la condición médica tiene el mismo nivel de severidad que se establece en el código, pero la misma por pruebas o exámenes médicos equivalentes y no necesariamente a través de los específicos que exige el mismo; o se llegó a requisitos
2. si una condición médica no está contemplada en ninguno de los códigos, pero la severidad o comparable a uno ya establecido; es similar
3. que un impedimento contemplado en un código no esté presente y pueda ser sustituido por otro equivalente y de igual severidad; o
c. por combinación de impedimentos
1. Cuando las condiciones médicas documentadas, por sí solas, no llenan ni igualan un código en particular, pero al considerarse en conjunto alcanzan un grado de severidad incapacitante.
La combinación será por el conjunto de las condiciones físicas, por el conjunto de las condiciones mentales o por combinación de ambas.
2. Si cumple con los requisitos administrativos de la Ley 447 de 15 de mayo de 1951, según enmendada:
a. Se considerará la posibilidad de combinación del Fondo del Seguro del Estado. Si no cualifica, entonces
b. Se considerará la posibilidad de combinación de condiciones no relacionadas.
c. En el caso de que la combinación de condiciones relacionadas por la Corporación del Fondo del Seguro del Estado y las no relacionadas, resulten incapacitantes, se adjudicará como Incapacidad no Ocupacional.
2. Si se determina que el participante está incapacitado, se otorgará el beneficio como total o permanente, si no se espera recuperación médica alguna. De no ser así, se otorgará el beneficio con exámenes médicos periódicos.
Asimismo, nuestro más Alto Foro ha establecido que “[l]a incapacidad que obligue al retiro del empleado con derecho a la anualidad que autoriza [la Ley Núm. 447] debe ser de tal naturaleza que le inhabilite para desempeñar las funciones de su empleo y de cualquier otro empleo remunerativo”. Sánchez v. A.S.R.E.G.J., 116 D.P.R. 372 (1985).
III
En síntesis, el recurrente alega que la Junta de Síndicos erró al denegar la pensión por incapacidad e *1186 interpretar restrictivamente la Ley 447 y descartar evidencia médica adecuada. Además, alega que las conclusiones de hechos son contrarias a derecho y no incluyen hechos esenciales. Finalmente, arguye que la recurrida abusó de su discreción al emitir una decisión inconsistente conforme al Reglamento y sin tomar en consideración que el recurrente está incapacitado por el Seguro Social. No le asiste la razón al recurrente en ninguno de estos planteamientos.
En principio, destacamos que en el caso de epígrafe la Administración sólo evaluó la pensión por incapacidad ocupacional del Sr. Díaz Fernández debido a que éste solicitó no ser considerado para una pensión por incapacidad no ocupacional, puesto que ya tiene aprobada y recibe una pensión diferida, la cual en términos económico sería similar a una pensión por incapacidad no ocupacional. Así pues, en este caso sólo se evaluaron las condiciones médicas relacionadas con la incapacidad ocupacional, es decir, la torcedura en la muñeca izquierda y el esguince dorso lumbar, ambas lesiones menos graves.
Aunque surge del expediente que el recurrente padece de otras condiciones músculoesqueletales que tienen consecuencias severas, como osteoartritis y obesidad, entre otras, éstas no se pueden considerar, ya que no son condiciones propiamente ocupacionales.
Específicamente sobre el estándar 10.08 del Manual, el récord sostiene que el recurrente no padece de afasia sensorial o motora que le provoque limitaciones en el habla, y no padece de una desorganización persistente y significativa de la función motora en sus extremidades. Por el contrario, la prueba documental revela que el recurrente no demuestra una marcha o postura comprometidas, y no necesita la ayuda de aditamento alguno para caminar, levantarse o apoyarse. En conclusión, la Junta de Síndicos concluyó que el recurrente no estaba incapacitado por las condiciones orgánicas neurológicas o músculoesqueletales.
Con relación a la condición emocional del recurrente, la prueba que obra en el expediente no estableció que éste se encuentre incapacitado para todo tipo de trabajo en el servicio público. El Sr. Díaz Fernández padece de ansiedad y rasgos depresivos, pero su capacidad emocional no se ha visto afectada de forma severa. El récord demuestra que el recurrente conserva su memoria y tiene capacidad para administrar sus bienes.
Por otro lado, a pesar de que el recurrente alega que intentó suicidarse en una ocasión y que tiene alucinaciones auditivas, no existe evidencia en el expediente que corrobore la veracidad de estas declaraciones, a pesar de las numerosas evaluaciones médicas que obran en el mismo.
Expresamente, la Parte I (C) del Manual dispone que “las opiniones o decisiones de incapacidad emitidas por otras fuentes, no obligan a la Administración a otorgar una incapacidad”. En consecuencia, el hecho de que el recurrente se encuentre incapacitado por el Seguro Social, no es vinculante para la Administración; ésta tiene la responsabilidad de evaluar el expediente médico a la luz de los estándares establecidos por la Ley 447, el Reglamento y el Manual. De este modo, la alegación hecha por el recurrente en el cuarto señalamiento de error carece de validez alguna.
La determinación de la Junta de Síndicos se fundamenta en la totalidad del expediente y la recurrida no abusó de su discreción o arbitrariedad al emitir su determinación. El recurrente solicitó una pensión ocupacional; por tanto, la recurrida por mandato estatutario sólo puede considerar las condiciones ocupacionales. . ... ............
En el caso ante nos, la Junta de Síndicos concluyó que con la prueba médica antes descrita el recurrente no era acreedor a la pensión solicitada porque las condiciones que padece no llenaban los requisitos de severidad de los listados aplicables. Somos del criterio que la recurrida aplicó correctamente el estándar establecido por la Ley 447, a saber: si las condiciones del recurrente lo incapacitaban total y permanentemente para cumplir los deberes de cualquier cargo o empleo retribuido, y evaluó adecuadamente la prueba médica sometida. En *1187 consecuencia, las conclusiones de Junta de Síndicos son cónsonas con el propósito de dicha legislación y no son arbitrarias, ilegales o irrazonables, por lo que debemos sostenerlas.
IV
Por los fundamentos expuestos, se confirma la resolución emitida por la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura el 15 de junio de 2009 y notificada el 8 de julio de 2009.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIO 2010 DTA 63

. La Sección 6.1 del Reglamento 6719 establece los requisitos para solicitar beneficio de pensión por incapacidad, a saber:
“A. Toda solicitud de beneficio de pensión (anualidad) por incapacidad, deberá incluir todos los documentos requeridos por el(la) Administrador(a) y estar debidamente completada, firmada y fechada por el(la) solicitante.
B. Los documentos requeridos por el(la) Administrador(a), son los siguientes:
(1) Solicitud de Pensión, debidamente completada, firmada y fechada por el(la) solicitante;
(2) Solicitud de Tarjeta de Identificación, acompañada de dos (2) retratos del(de la) solicitante, tamaño 2” x 2”;
(3) Notificación sobre Representación Legal;
(4) Autorización a la Administración para obtener información firmada por el(la) solicitante;
(5) Certificación de Servicios y Préstamos;
(6) Informe médico debidamente completado en todas sus partes. Deberá incluir el nombre del médico, especialidad, el número de licencia, dirección física en letra de molde, firmado y fechado por el médico;
La Certificación de Compensabilidad para la Administración emitida por la Corporación del Fondo del Seguro del Estado (modelo CFSE 0037, Abr. 2002), en el caso de una solicitud de pensión por incapacidad ocupacional.
C. El(la) Coordinador(a) revisará la documentación presentada por el(la) participante, asegurándose de que está completa, indicará la fecha de recibo de la solicitud utilizando el sello oficial del patrono y expedirá un recibo al(la) solicitante.
D. El (la) Coordinador(a) será responsable de gestionar e incluir los siguientes documentos:
(1) Expediente de Asuntos de Retiro;
(2) Anejo a la Forma 08-34;
(3) Hoja de Servicios con aportaciones, actualizada por el patrono;
(4) Certificación de Interrupciones en el Servicio;
(5) Declaración Individual o Certificación del Plan Acogido; no aplica a los miembros de la Policía de Puerto Rico;
(6) Copia certificada de la nómina especial evidenciando los ajustes en sueldos, si aplica;
*1188 (7) Copia de relación de costos de servicios no cotizados, copia del recibo de pago y certificación de descuentos de nómina desglosados, si aplica;
(8) Copia de transferencia de aportaciones, si aplica.
E. El(la) Administrador(a) podrá modificar o eliminar cualquiera de los documentos aquí establecidos, como también requerir cualquier otro documento nuevo de su autoría o de cualquier patrono, según se disponga mediante carta circular.
F. Las solicitudes de pensión por incapacidad serán radicadas por el(la) participante, su representante autorizado(a), o a petición del patrono, a través del(de la) Coordinadora). El(la) Coordinador(a) representará, diligenciará y será responsable de gestionar toda solicitud, petición o acción sobre beneficios y servicios solicitados por el(la) participante ante la Administración.
G. El(la) Coordinador(a) radicará ante el(la) Administrador(a) la solicitud, acompañada de los documentos requeridos, dentro de los sesenta (60) días siguientes al recibo de la misma. El(la) Administrador(a), será responsable de verificar y cotejar cada solicitud y que todos los documentos requeridos estén incluidos.
H. No se aceptarán solicitudes incompletas y se devolverá al(la) Coordinador(a) para que infonne y solicite los documentos requeridos al(la) participante o al patrono. El proceso de evaluación comenzará cuando la solicitud esté completa.
I. El(la) solicitante deberá cumplir con los requisitos contenidos en la Sección 6.2, sobre pensión por incapacidad ocupacional y/o la Sección 6.3, sobre pensión por incapacidad no ocupacional, para que su solicitud sea considerada.
J. Para los fines de una anualidad por incapacidad, se considerará incapacitado(a) a un(a) participante cuando la incapacidad esté sustentada con suficiente prueba médica, conforme a los Criterios adoptados por el(la) Administrador(a), y dicha prueba revele que el(la) participante está inhabilitado(a) para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado.
K. Si del análisis de la evidencia médica presentada, no se pudiese determinar si el(la) se encuentra o no incapacitado(a), el (la) Administrador(a) podrá requerir al(la) participante que se someta a exámenes adicionales con médicos seleccionados por éste. El(la) Administrador(a) emitirá su determinación final a base de la recomendación del Médico Asesor y los requisitos establecidos por Ley y Reglamento.
L. Toda solicitud de pensión por incapacidad aprobada, será referida para el proceso de cómputo y pago, tan pronto se reciba el informe de cambio de cesantía del patrono donde estuviere trabajando el(Ia) participante al momento de radicar la solicitud.
M. El pago de la anualidad por incapacidad, será retroactivo hasta un máximo de un (1) año, contado de forma regresiva a partir de la fecha en que fue determinada la incapacidad por el(la) Administrador(a), pero en ningún momento se extenderá más allá de la fecha en que el(la) participante radicó la solicitud de pensión. Para establecer la fecha en que fue determinada la incapacidad por el(la) Administrador(a), la Administración tomará la fecha de la comunicación mediante la cual el Director del Área de Incapacidad notificó al(la) participante la aprobación de la pensión.
N. De determinarse que el(la) no está incapacitado(a) o que no cumple con los requisitos administrativos que fije el(la) Administrador(a), se enviará una notificación mediante correo certificado, donde establecerá las razones por las cuales no le fue aprobada la pensión por incapacidad, así como su derecho y los términos para solicitar una reconsideración ante el (la) Administrador(a) o para presentar una apelación ante la Junta.
O. El(la) Administrador(a) podrá denegar la concesión de una anualidad por incapacidad a cualquier participante que haya hecho declaraciones falsas o falsificado o permitido la falsificación de cualquier información, registro o documento, con la intención de defraudar al Sistema para obtener una pensión, anualidad o cualquier otro beneficio relacionado con la incapacidad.”